**Slip Op. 15-16**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **VINH HOAN CORPORATION, ET AL.,** | |
| **Plaintiffs,** | |
| **and** | |
| **BINH AN SEAFOOD JOINT STOCK COMPANY,** | |
| **Plaintiff-Intervenor,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 13-00156** |
| **UNITED STATES,** | **Public Version** |
| **Defendant,** | |
| **and** | |
| **CATFISH FARMERS OF AMERICA, ET AL.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Remanding Commerce's antidumping duty administrative review.]

Dated: February 19, 2015

<u>Matthew Jon McConkey</u>, Mayer Brown LLP, of Washington, DC, argued for Vinh Hoan Corporation.

<u>Jonathan Michael Freed</u>, Trade Pacific, PLLC, of Washington, DC, argued for Vinh Quang Fisheries Corporation.

<u>Ned Herman Marshak</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for Vietnam Association of Seafood Exporters and Producers and Anvifish Joint Stock Company.  With him on the brief were <u>Andrew Brehm Schroth</u>, <u>Dharmendra Narain Choudhary</u>, and <u>Kavita Mohan</u>.

John Joseph Kenkel, deKieffer & Horgan, PLLC, of Washington, DC, argued for Binh An Seafood Joint Stock Company.

Ryan Michael Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.  Of Counsel on the brief was Devin Scott Sikes, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Nazakhtar Nikakhtar, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, DC, argued for Catfish Farmers of America, et al.  With her on the brief were Henry David Almond and Valerie A. Slater.

Kelly, Judge: This consolidated action comes before the court on USCIT Rule 56.2 motions for judgment on the agency record, challenging the Department of Commerce's ("Department" or "Commerce") determination in Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 78 Fed. Reg. 17,350 (Dep't Commerce Mar. 21, 2013) (final results of antidumping duty administrative review and new shipper reviews) ("Final Results"), as amended, 78 Fed. Reg. 29,323 (Dep't Commerce May 20, 2013) ("Amended Final Results"); see also Issues and Decision Memorandum for Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, A-552-801, (Mar. 13, 2013), available at http://enforcement.trade.gov/frn/summary/VIETNAM/2013-06550-1.pdf   (last   visited February 10, 2015) ("Decision Memo").

Vinh Hoan Corporation ("Vinh Hoan") commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a (2012).[1]  The court consolidated Vinh Hoan's challenge with actions filed by Vietnam Association of Seafood

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Exporters and Producers (collectively "VASEP"), Binh An Seafood Joint Stock Company ("Binh An"), Anvifish Joint Stock Company and Vinh Quang Fisheries Corporation ("Anvifish and Vinh Quang"), and Catfish Farmers of America, an association of processors and growers, and individual U.S. catfish processors, America's Catch, Alabama Catfish Inc. dba Harvest Select Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. dba Pride of Pond, and Simmons Farm Raised Catfish, Inc. (collectively "Catfish Farmers of America").  In addition to the above named parties' Rule 56.2 motions, Catfish Farmers of America filed a response, as a defendant-intervenor, in opposition to motions by VASEP, Vinh Hoan, Anvifish and Vinh Quang, and Binh An.  See Def.-Intervenors' Resp. Opp'n Pl.'s, Consol. Pls.', and Pl.-Intervenor's Rule 56.2 Mot. J. Agency R., May 22, 2014, ECF No. 79 ("Catfish Farmers of America's Resp.").  Vinh Hoan also filed a response, as a defendant-intervenor, in opposition to Catfish Farmers of America's motion.  See Resp. Def.-Intervenor Vinh Hoan Corp. Opp'n Pls. Catfish Farmers of America, et al.'s Rule 56.2 Mot. J. Upon Agency R. Supp. Pl. VASEP's Rule 56.2 Mot. J. Upon Agency R., May 22, 2014, ECF No. 80 (Vinh Hoan's Resp.").

Given the length of this opinion, an outline of the issues discussed should be helpful to the reader.  After a brief explanation of the background in the proceeding as well as the basis for jurisdiction and the standard of review the court will begin with a discussion of the legal framework for primary surrogate country selection.  Part II of the opinion considers Commerce's methodology in selecting a primary surrogate country as well as Commerce's analysis of nonfish factors of production, financial statements and whole fish in selecting a primary surrogate country.  Part III considers Commerce's

analysis of specific surrogate values.  Part IV reviews Commerce's treatment of certain sales as consignment sales.  Part V addresses the inclusion of sample transactions in Commerce's margin calculation.  Part VI analyzes a challenge to Commerce's normal value calculation for Vin Hoan, specifically its refusal to adjust the ratio used to value Vin Hoan's FOPs.

## BACKGROUND

On October 3, 2011, Commerce initiated this eighth antidumping ("AD") duty administrative review covering subject imports entered during the period of review ("POR"), August 1, 2010 through July 31, 2011.  See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 77 Fed. Reg. 56,180, 56,180 (Dep't Commerce Sept. 12, 2012) (preliminary results of the eighth antidumping duty administrative review and ninth new shipper reviews, partial rescission of review, and intent to revoke order in part) ("Preliminary Results").  Because Commerce treats Vietnam as a nonmarket economy ("NME") it selected a surrogate market economy country to value the factors of production of the subject imports.  Id. at 56,183.  During the preliminary results, Commerce chose Bangladesh as the primary surrogate country.  Id. at 56,184.  However, for the final results, Commerce chose Indonesia as the primary surrogate country.  Final Results at 17,351.

Commerce selected Anvifish and Vinh Hoan as mandatory respondents, initially assigning them respective rates of 1.34 dollars per kilogram ("USD/kg") and 0.19 USD/kg.  Final Results at 17,352-53.  Further, in accordance with its practice, Commerce assigned the average of these rates, 0.77 USD/kg, to nonselected, separate rate respondents.

Commerce also assigned a rate of 2.11 USD/kg to those who did not rebut the presumption of government control.  Id.  After receiving ministerial error allegations the Department revised the margin for Anvifish to 2.39 USD/kg and for the separate rate companies to 1.29 USD/kg.  Amended Final Results at 29,324.

VASEP, Vinh Hoan, Anvifish and Vinh Quang, and Binh An challenge Commerce's selection of Indonesia as the primary surrogate country.  See Mem. Law Supp. Pl.'s Rule 56.2 Mot. J. Upon Agency R. 8-61, Nov. 14, 2013, ECF No. 37 ("VASEP's Br."); Mem. Law Supp. Vinh Hoan Corp.'s Mot. J. Upon Agency R. 54-60, Nov. 14, 2013, ECF No. 39 ("Vinh Hoan's Br."); Mem. P. & A. Supp. Anvifish Joint Stock Co. and Vinh Quang Fisheries Corp. J. Upon Agency R. 10-26, Nov. 14, 2013, ECF No. 42 ("Anvifish's & Vinh Quang's Br."); Mot. J. On Agency R. Under USCIT Rule 56.2 1-3, Nov. 14, 2013, ECF No. 40 ("Binh An's Mot.").   Vinh Hoan also challenges Commerce's fish oil byproduct offset calculation, the values assigned to labor, two energy inputs and several by-products, the inclusion of "freight-in" in the selling, general, and administrative expense ratio, the inclusion of sample transactions in Vinh Hoan's margin calculation, the use of facts available on all of Vinh Hoan's consignment sales, and the inland freight and brokerage and handling calculation.  Vinh Hoan's Br. 7-54.  Vinh Hoan further claims that if it were not for Commerce's numerous errors, it would have been entitled to a de minimis margin which would have resulted in the revocation of the order as to Vin Hoan. Vinh Hoan's Br. 60.  Anvifish and Vinh Quang challenge Commerce's use of the Vitarich price quote to value Anvifish's byproducts and use of a Philippine company's financial

statement to calculate financial ratios.  Avifish's & Vinh Quang's Br. 19-33.[2]  Binh An joins

the arguments briefed by VASEP, Vinh Hoan, and Anvifish and Vinh Quang in all

respects.  Binh An's Mot. 1.

Catfish Farmers of America challenge Commerce's refusal to make an adjustment

to Vinh Hoan's normal value ("NV") and Commerce's calculation of Vinh Hoan's fish oil

byproduct offset.  Mem. Supp. Pls. Catfish Farmers of America, et al.'s Rule 56.2 Mot. J.

Upon Agency R. 6-25, Nov. 14, 2013, ECF No. 44 ("Catfish Farmers of America's Br.").

Defendant, United States ("Defendant"), responds that the court should sustain

Commerce's determinations except for Commerce's calculation of Vinh Hoan's fish oil

byproduct offset for which Defendant requests a voluntary remand.  Def.'s Resp. Pls.'

Mots. J. Upon Agency R. 2-3, May 22, 2014, ECF No. 77 ("Def.'s Resp.").

The court finds that Commerce's primary surrogate selection is contrary to law and

unsupported by substantial evidence.  Further, the court grants the Defendant's request

for a voluntary remand to reconsider its fish oil byproduct calculation.  The court also finds

Commerce's use of facts available for all of Vinh Hoan's CCEP sales is unsupported by

substantial evidence.  Moreover, the court sustains Commerce's inclusion of sample

sales in Vinh Hoan's margin calculation.  Finally, the court finds that Commerce's refusal

---

[2] Anvifish and Vinh Quang submitted their USCIT R. 56.2 motion and accompanying memorandum on November 14, 2013.  Subsequently, there was a substitution of attorney for Anvifish on May 8, 2014.  For ease of reference the court will continue to refer to the memorandum filed November 14, 2013 as "Avifish's & Vinh Quang's Br." and will refer to Anvifish and Vinh Quang together when discussing the arguments made in that brief.

to adjust Vinh Hoan's NV was not supported by substantial evidence. The court reserves

judgment on the remaining issues.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(2012), and 19 U.S.C.

§ 1516a(a) and "shall hold unlawful any determination, finding or conclusion found . . . to

be unsupported by substantial evidence on the record, or otherwise not in accordance

with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.      Primary Surrogate Country Selection: Legal Framework and Background**

In NME AD proceedings, Commerce generally calculates NV "on the basis of the

value of the factors of production utilized in producing the merchandise . . . [together with]

an amount for general expenses and profit plus the cost of containers, coverings, and

other expenses."   19 U.S.C. § 1677b(c)(1).   Commerce shall value the factors of

production "based on the best available information regarding the values of such factors

in a market economy country or countries considered to be appropriate by the

administering authority."  Id.  Moreover, to the extent possible, Commerce shall use "the

prices or costs of factors of production in one or more market economy countries that are-

- (A) at a level of economic development comparable to that of the nonmarket economy

country, and (B) significant producers of comparable merchandise."   19 U.S.C.

§ 1677b(c)(4).  While Commerce has broad discretion in deciding what constitutes the

best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323

(Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the

AD statute), it must ground its selection of the best available information in the overall purpose of the AD statute, calculating accurate dumping margins.  See CS Wind Vietnam Co. v. United States, 38 CIT __, __, 971 F. Supp. 2d 1271, 1277 (2014) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).

Commerce's regulatory preference is to "value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2)(2012).[3]  To implement this preference, Commerce selects a primary surrogate country, using a four step process.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at, http://enforcement.trade.gov/policy/bull04-1.html (last visited February 11, 2014) ("Policy Bulletin 04.1").  The process follows sequentially: (1) the Office of Policy ("OP") assembles "a list of potential surrogate countries that are at a comparable level of economic development to the NME country"; (2) Commerce identifies countries from the list "with producers of comparable merchandise"; (3) Commerce "determines whether any of the countries which produce comparable merchandise are 'significant' producers of that comparable merchandise"; and (4) if more than one country satisfies steps (1)-(3), Commerce will select "the country with the best factors data."  See generally id.

In this review, Commerce placed its list of potential surrogate countries on the record on November 22, 2011.  See Antidumping Duty Administrative Review of Certain

---

[3] Further citations to the Code of Federal Regulations is to the 2012 edition, unless otherwise noted.

Frozen Fish Fillets from the Socialist Republic of Vietnam ("Vietnam"): Surrogate Country

List, PD 22 at bar code 3042499-01 (Nov. 22, 2011) ("OP List").[4]  The OP List provided

Per Capita GNI values for the year 2010 from the World Bank's World Development

Report 2012 for Vietnam and six other countries that were deemed "economically

comparable."  Id.  These GNI values were Vietnam $1,100, Bangladesh $640, Pakistan

$1,050, Nicaragua $1,080, India $1,340, Philippines $2,050, and Indonesia $2,580.  Id.

In the preliminary results, Commerce explained that its longstanding practice is "to identify

those countries which are at a level of economic development similar to Vietnam in terms

of gross national income ("GNI") data available in the World Development Report

provided by the World Bank."  Preliminary Results at 56,183.[5]  Further, with respect to

the countries on the list, the Department stated that it was "satisfied that they [were]

equally comparable in terms of economic development . . . ."  Id.; see also Policy Bulletin

04.1 at n.5 (explaining that Commerce treats countries on the OP list as equal in terms of

---

[4] Defendant submitted an appendix to the administrative record, which can be found at
ECF No. 27-1, on June 19, 2013.

[5] Commerce's regulations provide that Commerce "place[s] primary emphasis on per
capita GDP as the measure of economic comparability."  19 C.F.R. § 351.408(b).  In 2007,
Commerce amended its methodology choosing to rely on per capita GNI as opposed to
per capita GDP "because while the two measures are very similar, per capita GNI is
reported across almost all countries by an authoritative source (the World Bank), and
because the Department believes that the per capita GNI represents the single best
measure of a country's level of total income and thus level of economic development."
Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries:
Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13246, 13246 n.2 (Dep't
Commerce Mar. 21, 2007) (request for comment); see also Clearon Corp. v. United
States, Slip Op. 14-88, 2014 WL 3643332, at *9-10 (CIT July 24, 2014) (finding
Commerce's reliance on GNI reasonable and in accordance with law).  The court notes
that no party has raised the issue of whether using GNI to determine economic
comparability is contrary to Commerce's regulation.

economic comparability because "the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country").  Next, Commerce found all six countries to be significant producers of comparable merchandise based on 2009 export data for frozen fish fillets from the United Nations Food and Agriculture Organization.  Preliminary Results at 56,183.  Because all six countries were economically comparable and significant producers of comparable merchandise, Commerce turned to data considerations.  Id.  Commerce explained that Bangladeshi Department of Agriculture Marketing, Ministry of Agriculture, online pangas price data ("DAM data") was the best available information on the record to value whole live fish, the factor of production which "account[ed] for the largest percentage of the NV as fish fillets are produced directly from whole live fish."  Id.  Based on this finding, Commerce selected Bangladesh as the primary surrogate country.  Id. at 56,184. Commerce issued its preliminary results on September 12, 2012.  After Commerce issued the preliminary results, the parties and Commerce continued to revisit the surrogate country selection.

On November 8, 2012, Commerce extended the deadline for submitting "surrogate value comments" to November 20, 2012.  Extension of Surrogate Value Submissions, PD 284 at bar code 3105147-01 (Nov. 8, 2012).  On November 20, 2012, VASEP submitted potential primary surrogate country lists for the administrative review and new shipper reviews covering the POR August 1, 2011 to July 31, 2012 ("Subsequent Review GNI

Lists")[6] in addition to GNI data for all countries from 2011 ("2011 GNI data") and GDP data for all countries from 2010 ("2010 GDP data").[7]   The petitioner below objected to VASEP's submission of the Subsequent Review GNI Lists "because they [did] not contain information to value respondents' factors of production."   Catfish Farmers of America's Surrogate Value Rebuttal Data Cover Letter 1-2, PD 376 at bar code 3108782-01 (Dec. 4, 2012).   VASEP responded by letter arguing that the exhibits should not be rejected. VASEP's Response to Petitioners Post-Prelim Surrogate Value Rebuttal, PD 388 at bar code 3110023-01 (Dec. 11, 2012).   The Department agreed with the petitioner.   See Rejection of New Factual Information, PD 395 at bar code 3111617-01 (Dec. 21, 2012). VASEP resubmitted its submission excluding the Subsequent Review GNI Lists but including the 2011 GNI and 2010 GDP data. See VASEP's Resubmission of Surrogate Value Submission of November 20, 2012, PD 404 at bar code 3112136-01 (Dec. 26, 2012).

After the parties filed case briefs, Commerce issued its final results choosing Indonesia as the primary surrogate country. Commerce began its analysis by explaining that it was "satisfied that [all countries on the OP List were] equally comparable in terms of economic development," and finding that all countries on the OP List were "exporters

---

[6] Commerce rejected the Subsequent Review GNI Lists as untimely filed new factual information.  They can be found as attachments to VASEP's brief.  See App. Pl.'s Mem. Law Supp. Rule 56.2 Mot. J. Upon Agency R. Docs. 5-6, Nov. 21, 2013, ECF No. 51-1.

[7] On the same day, Catfish Farmers of America submitted data to value the whole live fish input, which was accepted by Commerce.  CFA Surrogate Value Submission Ex. 3-4, PD 287 at bar code 3106818-01 (Nov. 20, 2012) ("IAS Data").  As will be discussed elsewhere, the IAS data played an important role in Commerce's decision to select Indonesia rather than Bangladesh as the primary surrogate country.

of frozen fish fillets and, thus, significant producers of comparable merchandise."

Decision Memo 3-10.  Commerce then turned to data considerations to make its primary

surrogate country selection.   Commerce eliminated India, Nicaragua, and Pakistan,

explaining that no party argued for valuing whole fish from those countries and, in any

event, the record did not contain suitable information from those countries.  Id. at 11.

Next, Commerce set out to compare the data for whole fish values from Bangladesh,

Indonesia, and the Philippines.  At the outset, Commerce noted that it was

> in the unusual situation of having on the record three sources of information
> issued by governments, which represent official statements of those
> governments as to the price of whole live fish – i.e., the Philippines FS,
> Indonesian AS, and DAM Data sources, and one source from an
> international organization, relevant to our analysis – i.e., the FAO FIGIS
> Data source.  While we typically do not scrutinize official government
> statistics in such detail, the necessity to respond to the comments raised by
> interested parties and to select one of the sources compelled us to do so in
> this case.

Decision Memo 12 (footnote omitted).

In  evaluating  these  sources,  Commerce  explained  that  it  "considers  several

criteria, including whether the SV data is contemporaneous, publicly available, tax and

duty exclusive, representative of a broad market average, and specific to the input."

Decision  Memo  19  (citation  omitted).     Commerce  found  all  sources  to  be

contemporaneous, publicly available, and tax and duty and exclusive.  Id. at 19-20.

In its broad market average discussion, Commerce found all three sources to be

broad  market  averages.     Id.  at  20-22  (disagreeing  with  respondents'  contentions

regarding Philippines FS and FAO FIGIS Data).  However, Commerce noted concerns

with Philippines FS Data collection methods and found that it was a less robust data

source than the other three.  Id. at 20-21.  Relying on this finding, Commerce found

Philippines FS not to be the best available information on the record.  Additionally,

Commerce explained several differences between the *DAM Data* on the record of the

current and prior administrative reviews.  Id. 21-22.  Commerce relied on these

differences to find "*DAM Data* to not represent as broad a market average as it did in the

last administrative review and not as broad a market average as the *Indonesian AS*."  Id.

at 22.

Next, Commerce discussed specificity.  After a lengthy discussion, Commerce

found "that the *FAO FIGIS Data* is not as species specific as the *DAM Data* or *Indonesian*

*AS*."  Decision Memo 25.  It explained that record evidence showed five species of

pangasius were grown in Indonesia, with two species being commonly grown.  Id.  It was

unclear which of these species were included in the *FAO FIGIS Data*.  Id.  Additionally,

unlike Indonesian AS, FAO FIGIS Data did not list the types of aquaculture areas from

which its data was collected.[8]  Id.  This omission was relevant because the record showed

that in Indonesia hypophthalmus (subject merchandise) was grown in ponds and cages

whereas jambal (not subject merchandise) was grown in rivers.  Id. at 24.  Thus, using

Indonesian AS, as opposed to FAO FIGIS Data, allowed Commerce to eliminate at least

some of its concerns about inclusion of other species grown in Indonesia.  Id.  Relying on

these findings and the fact that Indonesian AS was a primary source while FAO FIGIS

Data was not, Commerce concluded that FAO FIGIS Data was not the best available

---

[8] Aquacultures areas refer to different methods used to harvest the whole live fish input
used to produce subject merchandise.

information.  Id. at 25. Commerce also expressed concerns about whether dead fish were included in DAM Data values.  Commerce stated that respondents all indicated they only consume live fish.  Id. at 23. Commerce further explained that "because dead fish sell for less than live fish, [it] harbor[ed] concerns that the DAM Data may understate the price of the whole live fish FOP."  Id. at 23.  Relying on these findings, Commerce did "not find the DAM Data to be as specific as . . ." *Indonesian AS*.  Id.

Next, Commerce considered reliability.  First, it noted "that the *DAM Data* and *Indonesian AS* both have price fluctuations."  Decision Memo 26.  It explained that it did not consider any of the "SV choices . . . to be anomalous with regard to price variances and, thus, consider[ed] all sources equal in this regard."  Id.  However, Commerce found differences between the weekly and yearly average prices in the DAM Data.  As a result, Commerce "requested information from DAM concerning its collection and collation methods," to which DAM did not respond.  Id. at 26.  Commerce explained that it did not have the same concerns with regard to the Indonesian AS.  Id.  Concluding, Commerce explained Indonesian AS was the best available information on the record to value whole live fish because it did "not give rise to the unanswered questions posed by the extent to which dead fish is represented in the *DAM Data*, the extent to, and process by, which the *DAM Data* is examined for errors."  Decision Memo 27.

Turning to considerations other than whole live fish, Commerce explained that "factors other than whole fish and surrogate ratios account for a significant portion of direct materials and NV . . . ."  Decision Memo 10.  This conclusion was based on findings that Vinh Hoan was substantially integrated, many Vietnamese exporters of subject

merchandise had similar production experiences to Vinh Hoan, and Vinh Hoan was one of the largest exporters of subject merchandise.  <u>See</u> <u>id.</u> at 9.  It further explained that, "the far greater contemporaneity and demonstrated importance to the NV calculation of the additional FOP [sic] available from Indonesia" supported its primary surrogate country selection.  <u>Decision Memo</u> 27; <u>see also</u> <u>id.</u> at 10 (finding that with two exceptions all surrogate values for Indonesia were more contemporaneous than their Bangladeshi counterparts).  Finally, Commerce explained that it was selecting Indonesia as the primary surrogate country because it was economically comparable to Vietnam, a significant producer of comparable merchandise, provided the best available information to value whole live fish, and provided surrogate values for other factors of production that were much more contemporaneous than data from other potential surrogate countries. <u>Id.</u> at 27.

## II.      Primary Surrogate Country Selection: Analysis

Commerce's primary surrogate country selection suffered from several deficiencies and must be remanded for reconsideration for the following reasons. Commerce's refusal to consider 2011 GNI data that it had accepted as record evidence, refusal to consider relative economic comparability of potential surrogate countries, reliance on contemporaneity of nonfish factors to the exclusion of other data considerations, and failure to compare the relative quality of financial statements made its determination contrary to law.  Additionally, these legal deficiencies caused Commerce to ignore relevant detracting evidence.  Moreover, Commerce's preference for Indonesian data to value whole live fish was not supported by substantial evidence.  Thus,

Commerce's primary surrogate country selection is both contrary to law and not supported by substantial evidence.

### A.  Primary Surrogate Country Selection: Data and Methodology

### 1.  Commerce Must Consider 2011 GNI Record Evidence

The parties dispute what evidence Commerce must consider in making its primary surrogate country selection. Commerce disregarded record evidence of 2011 GNI data, VASEP's Resubmission of Surrogate Value Submission of November 20, 2012 Ex. 3C, PD 404-405 at bar code 3112136-01-02, (Dec. 26, 2012), and 2010 GDP data, VASEP's First Surrogate Value Rebuttal Submission Ex. 20F, PD 212 at bar code 3081393-03 (June 18, 2012).  See also VASEP's Br. at 16.  It also rejected submission of the Subsequent Review GNI Lists as untimely filed "new factual information."  Rejection of New Factual Information, PD 395 at bar code 3111617-01 (Dec. 21, 2012).  VASEP argues Commerce's decision to consider the 2010 GNI data from the OP List, but not to consider 2011 GNI data and 2010 GDP data, and to reject Subsequent Review GNI Lists was contrary to law.  The court finds that Commerce's decision to disregard the 2011 GNI data is contrary to law.  However, the court sustains Commerce's decisions to disregard the 2010 GDP data and reject Subsequent Review GNI Lists.

Commerce set "November 22, 2011 through May 23, 2012" as the time for submitting "any information the Department should consider when selecting the surrogate country."  Decision Memo 4 (citing Commerce Letter Re: Deadline for Surrogate Country and Surrogate Value Submissions, PD 127 at bar code 3075253-01 (Apr. 27, 2012)).  VASEP submitted new information on November 20, 2012.  Commerce accepted the GNI

data and GDP data onto the record, but rejected the Subsequent Review GNI Lists as untimely filed new factual information pursuant to 19 C.F.R. § 351.301(b)(2).  Despite accepting the 2011 GNI and 2010 GDP and putting it on the record, Commerce nevertheless refused to rely on that data when choosing a primary surrogate country explaining that it "considers the selection of potential surrogate countries to be similar to the selection of mandatory respondents in an administrative review  . . . [it] must be resolved early in the case in order to provide sufficient time for party participation and the necessary analysis."  Decision Memo 4.  Commerce explained that the 2011 GNI and 2010 GDP data "was not available on the record of this review for the Department to use at the time we made our surrogate country selection."[9]  Further, no party challenged the list of potential surrogate countries during that time.  Finally, Commerce explained that, "[r]evising the list of surrogate countries at a later date would be potentially unfair to the parties and create undue administrative difficulties."  Decision Memo 5.

   The court sustains Commerce's decision to disregard the 2010 GDP data. Commerce stated that its long-standing practice has been to evaluate "GNI data available in the *World Development Report* provided by the World Bank."  Decision Memo 3.  See

---

[9] It is not clear what Commerce is referring to here when it says "at the time we made our surrogate country selection."  Commerce made its surrogate country selection, choosing Indonesia, when it issued its final results on March 21, 2013.  Clearly this information was available at this time.  In the very next sentence Commerce states "[t]hus the Surrogate Country List which the Department released on November 22, 2011 contained the most up-to-date information . . . ."  Decision Memo 4.  This sentence suggests that Commerce was referring to the date on which it issued the OP List, November 22, 2011.  If Commerce is referring to the November 22, 2011 date, this position would appear to undercut the value of the comment period.

also Policy Bulletin 04.1 at n.4.    Defendant explains that Commerce's decision not to consider GDP data was based on this past practice and apparent judicial affirmation. Def.'s Resp. 21-22.  Additionally, Defendant argues that GDP data is unreliable because it is derived from two sources, the World Bank and the International Monetary Fund, and there is nothing on the record showing these organizations reported GDP on a consistent basis with each other.  Id. at 22.  VASEP has not attempted to distinguish its arguments between Commerce's disregard of the GDP data and its disregard of the GNI data.  Thus, there is no challenge to Commerce's preference and practice of relying on GNI data to make its economically comparable determination before the court.[10]  Thus, the court finds that Commerce has provided a reasonable explanation for disregarding 2010 GDP data.

Commerce's rejection of the Subsequent Review GNI Lists was in accordance with law.    The Department's regulations specify deadlines for when parties must make submissions.  See e.g.  19 C.F.R. § 351.301(a) (providing that "[t]his section sets forth the time limits for submitting such factual information, including . . . publicly available information to value factors in nonmarket economy cases").  In general for final results of administrative reviews, factual information is due "140 days after the last day of the anniversary month . . . ." 19 C.F.R. § 351.301(b)(2).  "Factual information" means "(i) [i]nitial and supplemental questionnaire responses; (ii) [d]ata or statements of fact in support of allegations; (iii) [o]ther data or statements of facts; and (iv) [d]ocumentary

---

[10] The court notes that Commerce's practice has been judicially affirmed in other cases, see e.g. Jiaxing Bro. Fastener Co., v. United States, 38 CIT __, 961 F. Supp. 2d 1323 (2014); Clearon Corp., Slip Op. 14-88, 2014 WL 3643332, but expresses no opinion as to the reasonableness of Commerce's methodology.

evidence."   19 C.F.R. § 351.102(b)(21).   In addition, notwithstanding 19 C.F.R. § 351.301(b)(2), interested parties may submit publicly available information to value factors of production within "20 days after the date of publication of the preliminary results of review."   19 C.F.R. § 351.301(c)(3)(ii).

Commerce rejected VASEP's submission of the Subsequent Review GNI Lists explaining that,

> [t]hough styled as a submission filed pursuant to section 351.301(c)(3) of the Department's regulations, we find that Vinh Hoan Corporation's and VASEP's submissions of November 20, 2012 do not only contain information to value respondents' factors of production.   Instead, these submissions contain new factual information pertaining to the selection of a surrogate country, and this factual information is untimely pursuant to section 351.301(b)(2) of the Department's regulations.

Rejection of New Factual Information, PD 395 at bar code 3111617-01 (Dec. 21, 2012). Here, Defendant elaborates on Commerce's reasoning.   It explains that VASEP's characterization of the Subsequent Review GNI Lists as information to value factors of production was improper because Commerce does not have to consider relative economic comparability and the economic comparability of the potential surrogate does not factor into Commerce's finding of what constitutes the "best available information" for calculating individual surrogate values.

Commerce categorized the Subsequent Review GNI Lists as "factual information" under 19 C.F.R. § 351.301(b)(2) as opposed to "publicly available information to value factors" under 19 C.F.R. § 351.301(c)(3).   It is undoubtedly true that the selection of the primary surrogate country is central to Commerce's selection of sources to value a respondent's factors of production.   Thus, it follows that factual information submitted

regarding the economic comparability of the primary surrogate country is at least indirectly tied to valuing a respondent's factors of production.   However, it is a reasonable application of 19 C.F.R. 351.301(c)(3) that "publicly available information to value factors" refers to information that will be used to directly value a specific factor, rather than indirectly value a specific factor because it influences the choice of the primary surrogate country.  Thus, the court cannot say that Commerce arbitrarily or unreasonably applied its regulations. Moreover, in light of Commerce's broad discretion in establishing rules and procedures including enforcing time limits, the court cannot say that Commerce abused its discretion.  See e.g. Yantai Timken Co. v. United States, 31 CIT 1741, 521 F. Supp. 2d 1356, (2007); Reiner Brach GmbH & Co. v. United States, 26 CIT 549, 206 F. Supp. 2d 1323 (2002).[11]

The court cannot sustain Commerce's decision to disregard the 2011 GNI data. Commerce must consider record evidence pertaining to economic comparability and its failure to do so here is contrary to law.  The statute requires that Commerce must, to the extent possible, use surrogate data from a market economy country or countries that are at "a level of economic development comparable to that of the nonmarket economy country" and "significant producers of comparable merchandise."   19 U.S.C. §

---

[11] VASEP also argues that the Subsequent Review GNI Lists are "practices, methodologies, and standards" which the court should order Commerce to consider on remand.  See VASEP's Br. 24-25.  The court declines this invitation.  The Subsequent Review GNI Lists are not a practice, methodology, or standard, but rather a product of Commerce's analysis of information including 2011 GNI data from subsequent reviews. None of the cases cited by VASEP are on point.  Additionally, the court will not take judicial notice of properly rejected information.

1677b(c)(4).  Further, Commerce must base its analysis on the best available information.

19 U.S.C. § 1677b(c)(1).  Here, Commerce had information on the record that informed

the precise question in front of it and it chose to disregard it.  This decision was contrary

to law.

Commerce justifies its position by erecting a straw man, namely that considering

the data could only be used to revise the potential surrogate country list.  First, Commerce

explains that "[r]evising the list of surrogate countries at a later date would be potentially

unfair to the parties and create undue administrative difficulties."  Decision Memo 5.

Commerce's implication is that Plaintiffs' only reason to have Commerce consider the

2011 GNI data is to establish a new list of economically comparable countries.  While

Plaintiffs may or may not have desired such an outcome, they clearly wanted Commerce

to choose a country other than the one it ultimately chose.  Commerce confuses two

separate determinations: (1) creating a list of potential countries; and (2) selecting a

primary surrogate country.  This confusion can be illustrated by two consecutive

sentences in the Decision Memo:

> The World Bank GNI/GDP data submitted by VASEP was not available on
> the record of this review for the Department to use at the time when we
> made our surrogate country selection, as it is dated September 27, 2012,
> after the Department made its surrogate country determination.  Thus, the
> Surrogate Country List which the Department released on November 22,
> 2011 contained the most up-to-date information accessible from the World
> Bank regarding countries economically comparable to Vietnam.

Decision Memo 4 (emphasis added).  Commerce would not have to revise the list of

surrogate countries in order to take the 2011 GNI data into consideration when it made

its primary surrogate country selection.  The 2011 GNI data was record evidence, accepted by Commerce, that Plaintiffs contend could affect the primary surrogate country selection analysis.  Specifically, Plaintiffs argue it could affect the analysis of the relative economic comparability of the countries on the list.  The court agrees.  As will be discussed below, Commerce's premise that relative economic comparability is irrelevant cannot withstand scrutiny.  Moreover, it is possible that Commerce could have considered the data to reassess whether Indonesia was economically comparable.

Second, Commerce claims it will not consider the GNI data because "no party timely challenged the list. . . ." Decision Memo 4. Commerce noted "that at no time during the surrogate country comment period did any party, including VASEP, submit any new information or in any way contest the Surrogate Country List." Decision Memo 5. Commerce seems to argue that in conducting its analysis it will only consider record evidence submitted up to a point in time.  Thus, Commerce contends that after the comment period for having a country remain on the OP List, the parties were foreclosed from submitting evidence and making any arguments related to the selection of a primary surrogate country.  Defendant contends that it would be unfair for Commerce to have considered the GNI data without offering other interested parties the chance to comment on the data, and it would be inappropriate for Commerce to consider the data without such comment.  Def.'s Resp.  23.

Despite these arguments, Commerce clearly did not complete its analysis on May 23, 2012 because it changed its surrogate country selection after the preliminary results

were issued on September 12, 2012.[12]  Moreover, Commerce considered data submitted

after the preliminary results to make its selection.  See supra n. 7.    Commerce was still

under an obligation to consider all the record evidence in conducting its analysis, which

was obviously ongoing, even if the parties were foreclosed from offering arguments.

Therefore, given that Commerce accepted the GNI data, was still in the process of

selecting a surrogate country, and considered data submitted by other parties submitted

on the same day, Commerce must consider the GNI data.

The Court has previously rejected Commerce's attempts to disregard record GNI

data that should be considered in Commerce's primary surrogate country analysis. See

Dupont Teijin Films v. United States, 37 CIT __, __, 896 F. Supp. 2d 1302 (2013) ("Dupont

I") and Dupont Teijin Films v. United States, 37 CIT __, __, 931 F. Supp. 2d 1297 (2013)

("Dupont II") (collectively "the Dupont line").  In the Dupont line, which the court finds on

point and persuasive, Commerce placed its OP List on the record with six countries that

were economically comparable to China based on 2008 GNI data.  Dupont I at 1304.  The

list included India.  Plaintiff-petitioners timely submitted 2009 per capita GNI data and

argued that it was the best available information on which Commerce should base its

economic comparability decision.  Id. at 1305.  However, Commerce found India was

economically comparable based on 2008 GNI data and chose India as the primary

---

[12] VASEP submitted the information on Nov. 20, 2012.  Catfish Farmers of America, argued the Subsequent Review GNI Lists should be rejected on Dec. 4, 2012.  VASEP responded on Dec. 11, 2012.  Commerce agreed with Catfish Farmers of America, rejected the Subsequent Review GNI Lists, and instructed VASEP to refile without them on December 21, 2012.  VASEP resubmitted on December 26, 2012.  See supra Section I.

surrogate country.  Id.  In Dupont I, the court found that Commerce's reliance on 2008 GNI data without a reasonable explanation made its determination unsupported by substantial evidence.  Id. at 1307.  After remand, Commerce provided a new explanation for disregarding the 2009 GNI data, "that although the 2009 GNI data were placed on the record within the time permitted for submission of factual information, they were submitted too late in the proceedings to be considered by the OP when making its list of economically comparable countries."  Dupont II at 1300.  The court rejected this rationale explaining that administrative burdens could not excuse Commerce from complying with statutory obligations including determining accurate dumping margins and using data from an economically comparable country.  Id. at 1305.  The court further explained that Commerce could create a new deadline for parties to submit GNI data, prior to the deadline for the submission of factual information, pursuant to the APA if administrative constraints so required.  Id. at 1307.

Here, like in the Dupont line, Commerce seeks to justify its refusal to consider 2011 GNI record evidence based on administrative constraints.  There is nothing in the administrative record of this case that makes the reasoning in the Dupont line less compelling.  In fact, here, Commerce's justification, that "the selection of potential surrogate countries [is] similar to the selection of mandatory respondents in an administrative review – both are very important to the proceeding and must be resolved early in the case in order to provide sufficient time for party participation and the necessary analysis," Decision Memo 4, is even further undercut by Commerce's reversal of its primary surrogate selection between the preliminary and final results.

Defendant attempts to distinguish the <u>Dupont</u> line based upon the timing of the submission in the instant case.  Defendant argues that in the <u>Dupont</u> line, the information had been submitted prior to the preliminary results whereas here VASEP did not submit the information until much later in the proceeding.  Def.'s Resp. 23.  Additionally, in the <u>Dupont</u> line, Commerce "had the benefit of interested party comments on the data in both case and rebuttal briefs."  <u>Id.</u> at 24.  Defendant goes so far as to state that "VASEP waited until January 11, 2013, when it filed its rebuttal brief, to put interested parties and Commerce on notice that it regarded the 2011 GNI data as relevant."  <u>Id.</u> (citation omitted).[13]

The Defendant's timing argument is not only a *post hoc* rationale, it mischaracterizes the sequence of events and identifies a distinction that has no relevance in this case.  VASEP originally submitted the data on November 20, 2012 and only resubmitted it on December 26, 2012 after Commerce rejected VASEP's submission of the Subsequent Review GNI Lists.  Moreover, in this case it would be nonsensical to rely upon the issuance of the preliminary results as a cutoff date for considering information.  Here, Commerce changed its surrogate country selection after it issued the preliminary results.  Clearly, Commerce did not finalize its primary surrogate country selection by May

---

[13] At oral argument, Defendant explained that argument based on the 2011 GNI data was made for the first time in VASEP's rebuttal brief in contravention of 19 C.F.R. § 351.309(c)(2).  VASEP responded that this argument was made in the rebuttal brief because VASEP agreed with Commerce's selection of Bangladesh in the preliminary results and was making the argument as rebuttal.  The court will not rule on this argument because it is both a *post hoc* rationale for Commerce's disregard of the 2011 GNI data and was not raised until oral argument.

23, 2012, the timeframe Commerce asked for comments and data on economic comparability, or by September 12, 2012, the date of publication for the preliminary results.  Moreover, this is not a case where the parties advocated for a country that was not on the original OP List.  All parties had the opportunity to submit surrogate value data from Indonesia, Bangladesh, and other countries.  In fact, if the parties had relied on Commerce's selection of Bangladesh in the preliminary results, they would not have submitted data or argument concerning the country that was ultimately selected.[14]

Commerce cannot ignore record data covering 7 out of 12 months of the POR, which may affect its choice of a primary surrogate country. In both the underlying proceeding in the <u>Dupont</u> line and here, Commerce accepted evidence on the record which it ignored in making its primary surrogate country selection, and that evidence was submitted after the time period Commerce set for surrogate country selection comments. The important difference between the <u>Dupont</u> line and this proceeding is that here, Commerce changed its selection, indicating that the primary surrogate country issue had not been resolved, like "mandatory respondents . . . early in the case." Thus, in this case, Commerce has even less justification for its actions than it did in the <u>Dupont</u> line.

Finally, Defendant argues that Commerce's determination in the final results to use Indonesia instead of Bangladesh as the primary surrogate country was based on data considerations, a separate inquiry from determining what countries are at a level of economic development comparable to Vietnam.  Def.'s Resp. 24.  This argument is

---

[14] Along these same lines, parties always run the risk of submitting information from a country or countries that is not ultimately selected.

unpersuasive and even further undermines Commerce's other justifications.  The idea that administrative constraints on the one hand restrict Commerce from considering GNI data that covers 7 out of 12 months of the POR, but do not restrict Commerce from considering new data from each potential primary surrogate country, such as the IAS data to value whole live fish submitted on the same day, is nonsensical.  Commerce fails to explain why its primary surrogate country analysis for its preliminary determination considers economic comparability, significant production of comparable merchandise, and comparison of available data and its analysis for its final determination only analyzes data considerations.  As such, its determination is not in accordance with law.[15]

### 2.  Relative Economic Comparability

The parties dispute whether Commerce was required to, and did in fact, compare the relative economic comparability of the countries on its OP List.  VASEP argues that the statute requires such a comparison and one was not done here.  See generally VASEP's Br. 21-22.  Defendant argues that a comparison is not required but, that even if it were, Commerce has fulfilled any such obligation in this case because it "'thoroughly analyzed' the remaining surrogate country criteria." Def.'s Resp. 25. The court finds that the record in this case requires Commerce to compare relative economic comparability with the data of the potential surrogate countries and here, Commerce has not done so.

---

[15] As stated above, no party advocates for a country that was not on the original OP List. Thus, the parties and Commerce were not deprived of the opportunity to submit and consider any data from Indonesia or Bangladesh.

As previously discussed, the statute requires Commerce to value the "factors of production in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Commerce has considerable discretion in applying these statutory requirements.  Despite its admittedly broad discretion, Commerce cannot lose sight of the overall statutory goal, i.e., to determine accurate dumping margins. See CS Wind Vietnam Co., 38 CIT __, __, 971 F.Supp.2d at 1277 (citing Rhone Poulenc, 899 F.2d at 1191; see also Parkdale Inten., 475 F.3d at 1380.  Given this constraint on Commerce's discretion, the court must determine whether Commerce's application of its policy in this case was a reasonable approach to determine accurate dumping margins.  The court finds that it was not.

Commerce's obligation to determine accurate dumping margins bounds its discretion.  Commerce's general policy is to consider all economically comparable countries to be equally comparable, eliminate countries which are not significant producers of comparable merchandise and then choose the country with the best factors data.  This policy may often be a reasonable means to obtain accurate dumping margins; it was not here.  Here, Commerce was faced with the "unusual situation of having on the record three sources of information issued by governments, which represent official statements of those governments as to the price of whole live fish – i.e., the Philippines FS, Indonesian AS, and DAM Data sources, and one source from an international organization, relevant to [its] analysis – i.e., the FAO FIGIS Data source." Decision Memo 12.  Commerce itself noted that "[w]hile [it] typically do[es] not scrutinize official

government statistics in such detail, the necessity to respond to the comments raised by

interested parties and to select one of the sources compelled [it] to do so in this case."

Id.  In light of its obligation to determine accurate dumping margins, the statute requires

Commerce to consider the relative economic comparability of the economically

comparable countries and to weigh these differences against the strengths and

weaknesses of the factors data.

        As both parties note in their briefs, the question of relative economic comparability

was addressed by this Court in Ad Hoc Shrimp Trade Action Comm. v. United States, 36

CIT __, __, 882 F. Supp. 2d 1366 (2012) ("Ad Hoc Shrimp I").   In the underlying

administrative proceeding of Ad Hoc Shrimp I, Commerce justified its refusal to compare

relative GNIs by stating "the statute does not require Commerce to use a surrogate

country that is at a level of economic development *most* comparable to the NME country

. . . ." Id. at 1374.  The court rejected this justification, explaining that "Commerce's policy

of disregarding relative GNI differences among potential surrogates for whom quality data

is available and who are significant producers of comparable merchandise is not

reasonable, because it arbitrarily discounts the value of economic comparability relative

to the remaining eligibility criteria."  Id.  The court further elaborated that "[b]ecause none

of Commerce's three surrogate country eligibility criteria is preeminent, it follows that

relative strengths and weaknesses among potential surrogates must be weighed by

evaluating the extent to which the potential surrogates satisfy each of the three criteria."

Id. at 1374-1375.[16]

Implicit in the Ad Hoc Shrimp I holding is that Commerce's justification ignores

relevant sections of the statute and its overall purpose.   Although Commerce is not

required to choose a primary surrogate country that is the most economically comparable,

Commerce is required to use the best available information to value the factors of

production.   See, e.g., Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377

(Fed. Cir. 1999) (explaining the flexibility provided by 19 U.S.C. § 1677b(c) but stating it

"mandates that Commerce value the factors of production on the basis of 'the best

---

[16] The court notes that during the course of the remand proceedings the government moved the court to expand the scope of the previously ordered remand so that it could consider new information showing that the mandatory respondent had provided false or incomplete information.   See Ad Hoc Shrimp Trade Action Comm. v. United States, 37 CIT __, __, 882 F. Supp. 2d 1377 (2013).   The court granted the government's motion. See id. at 1381-82.   After remand, Commerce concluded that the mandatory respondent had not shown it was eligible for a separate rate.   See Ad Hoc Shrimp Trade Action Comm. v. United States, 37 CIT __, __, 925 F. Supp. 2d 1315, 1317 (2013).   The court affirmed this finding.   See id.   Thus, neither the court nor Commerce had the opportunity to address the issue that the court originally remanded, i.e., the importance of the relative economic comparability.   However, in another proceeding before the court challenging Commerce's subsequent administrative review, the court did have occasion to explain its prior remand.   See Ad Hoc Shrimp Trade Action Comm. v. United States, 38 __, __, 986 F.Supp.2d 1362 (2014) (explaining that in Ad Hoc Shrimp I the court remanded Commerce's selection of a surrogate country over another surrogate country when the data for each country were only slightly different and the country with the slightly worse data was much closer in GNI and a more significant producer of comparable merchandise).   This suggests that the court's point in Ad Hoc Shrimp I was not that Commerce is required to assess the relative economic comparability in each case but only when the facts require.   This reading also makes sense in light of the statutory framework.   See 19 U.S.C. § 1677b(c) (directing Commerce to value the factors of production from prices or costs in a market economy that is at a comparable level of economic development to the extent possible and use the best available information).

available information regarding the values of such factors in a market economy country.'"

(citing 19 U.S.C. § 1677b(c)(1)).   Commerce's explanation segregates its choice of the

best available information to value the factors of production from its selection of the

primary surrogate country.  However, these analyses are not wholly distinct.  The reason

Commerce chooses countries that are economically comparable is so that it can value a

respondent's factors of production with information from that country.  The statute directs

Commerce to value the factors of production based on the best available information from

"a market economy country or countries," thus leaving it to Commerce's discretion

whether to choose one primary surrogate country.   However, as discussed above,

Commerce has, by regulation, indicated its preference to use information from one

primary surrogate country to value factors of production, see 19 C.F.R. § 351.408(c)(2),

and  it did so here.  See Decision Memo 30 (surrogate financial ratios); Decision Memo

31 (labor); Decision Memo 32 (sawdust); Decision Memo 33 (rice husk).  The court

expresses no opinion as to whether Commerce would be required under all

circumstances to consider relative GNI in relation to data quality differences.

Commerce dismisses the need to address relative economic comparability in this

case, relying on its analysis of producers of comparable merchandise and data.  Below,

Commerce explained that

> [w]hile the Department continues to disagree with the Court that the statute
> requires it to compare relative GNI comparability in its analysis, in these
> reviews, the Department nevertheless has thoroughly analyzed whether the
> potential surrogate countries are significant producers of comparable
> merchandise and the availability of whole fish data in certain of the potential
> surrogate countries.   Therefore, we view the scenario that the Court
> addressed in *PRC Shrimp Remand* is [sic] distinct from the instant reviews.

Decision Memo 5.  Based on the preceding, Commerce continued to treat all countries on the OP List as equally economically comparable.  Id. at 6. Although Commerce claims that it "thoroughly analyzed" the statutory criteria, the record does not reveal that it did.

In its comparison of the data for whole live fish, the factor with the most influence on respondents' NV, Commerce noted that it "typically [does] not scrutinize official government statistics in such detail . . . ."  Decision Memo 12.  Thus from the outset, Commerce indicated the unusual level of scrutiny it would need to apply to distinguish between otherwise usable data sets.  Notably, nowhere did Commerce find that the *DAM Data* did not satisfy any one of its criteria (i.e., contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the input).  Instead, Commerce found that *DAM Data* did not represent as broad a market average as *Indonesian AS*, was not as specific as *Indonesian AS* and gave Commerce concerns about the extent to which *DAM Data* was examined for errors.  As discussed more fully below, Commerce found *Indonesian AS* and *DAM Data* to be equally contemporaneous despite the fact that *Indonesian AS* covered the entire POR as well as 12 months outside the POR and *DAM Data* covered the POR precisely.  Here, like in Ad Hoc Shrimp I, the record does not belie a finding that a comparison of the *DAM Data* and *Indonesian AS* makes the choice of Indonesia so clear cut that weighing the relative GNIs of the countries would not improve Commerce's selection of the best available information.

Defendant responds to Plaintiffs' arguments by reiterating Commerce's explanations, and arguing that Commerce's practice of considering all countries on an OP list to be economically comparable "recognizes that the 'level' in an economic

development context necessarily implies a range of per capita GNI, not a specific per capita GNI."  Def.'s Resp. 27 (citing Policy Bulletin 04.1; <u>Decision Memo</u> 3-4).  Defendant further argues Commerce found that Indonesia was at the same level of economic development, a finding that satisfies the statutory requirement for using a country at a level of economic development comparable to the NME.  Defendant also argues that the statute does not prohibit Commerce from relying upon data quality to choose among otherwise qualified countries.  Defendant also characterizes Commerce's analysis as finding Bangladesh data unreliable and Indonesian data superior to Bangladesh data.

These arguments are unpersuasive for several reasons.  First, Plaintiffs do not argue that Commerce should blindly choose the primary surrogate country based on which country is the "most" economically comparable.  Nor does the court suggest that the analysis should hinge on which country is the "most" economically comparable.  As discussed above, the ultimate question is what is the best available information to value the respondents' factors of production?  Thus, Commerce must choose the country that furthers this goal.  The analysis suggested by <u>Ad Hoc Shrimp I</u>, and adopted here, is that Commerce must compare differences in economic comparability with differences in the other factors, including data quality, when the facts so require.

Second, Defendant ignores the statutory framework by isolating Commerce's economic comparability finding.  As discussed above, that is not what the statute and regulatory scheme imposed by Commerce, through its preference of valuing factors from a single country, provide.

Third, Defendant's argument that Commerce found Bangladesh data unreliable, mischaracterizes Commerce's actual findings as provided in the Decision Memo. Commerce did find that *DAM Data* for whole live fish was less broadly representative, less specific, and less reliable than *Indonesian AS* data for whole fish, but it did not find that *DAM Data* for whole live fish was not broadly representative, not specific or unreliable.  If Commerce had found *DAM Data* for whole live fish was unreliable the court would consider whether Commerce's finding in that regard was supported by substantial evidence, but here Commerce did not make any such finding.  Additionally as discussed below, Commerce determined to make relative comparisons with respect to some of its criteria but refused to do so for contemporaneity where *DAM Data* for whole live fish covered the POR precisely and *Indonesian AS* data for whole live fish covered the POR and an additional 12 months.  Finally, Commerce also explained that it considered the data for other factors including, for example, the surrogate financial ratios. In its analysis for choosing DSFI's financial statement as the best available information to value financial ratios, Commerce specifically refused to discuss financial statements from Bangladesh "because [it had] a surrogate financial statement from the primary surrogate country . . . ." Decision Memo 30.  Thus, it is unclear if Indonesia provided better information to value financial ratios.[17]  A similar rationale was provided for several other surrogate values as discussed in Section II.B in this opinion.  See infra section II.B.

---

[17] In the Decision Memo Commerce further explains "[c]ombined with the far greater contemporaneity and demonstrated importance to the NV calculation of the additional

(footnote continued)

Defendant also cites to <u>Jiaxing Bro. Fastener Co. v. United States</u>, 38 CIT __, 961 F. Supp. 2d 1323 (2014) to argue Commerce's explanation that it must select its primary surrogate country early in the process is valid.  In <u>Jiaxing Bro.</u>, the plaintiff challenged Commerce's methodology of using per capita GNI to measure economic comparability as opposed to a method proposed by the plaintiff.  <u>Id.</u> at 1329-30.  The court found Commerce's methodology to be a reasonable reading of the statute under the second prong of <u>Chevron</u>.  <u>Id.</u>  However, as explained in <u>Clearon Corp.</u>, the challenge at issue in <u>Jiaxing Bro.</u>, was to the initial placement of a country on the potential surrogates list, not "the merits of each of the potential surrogates on the list relative to each other."  <u>Clearon Corp.</u>, Slip Op. 14-88, 2014 WL 3643332, at *10-12.  Moreover, the court in <u>Jiaxing Bro.</u>, also expressed agreement with the <u>Dupont</u> line and <u>Ad Hoc Shrimp I</u>.  <u>Id.</u> at 1329   (citing <u>Dupont I</u> at 1306-1310; <u>Ad Hoc Shrimp I</u> at 1374-76)).

The court takes no position as to the relative economic comparability of any of the countries on the OP List as compared to Vietnam.  Additionally, the court does not take any position as to how the OP List countries' relative differences in GNI compare to any

---

FOP available from Indonesia we have, consequently, selected Indonesia as the primary surrogate country because it is economically comparable to Vietnam, is a significant producer of comparable merchandise, and has the best available information with which to value the main input into the subject merchandise, whole live fish."  <u>Id.</u> at 27.  This finding does not save Commerce's analysis.  As discussed in an above example, Commerce refused to compare data to value surrogate financial ratios, labor, and other factors of production from Indonesia and Bangladesh based on its practice to value all factors in the primary surrogate country.  It cannot base its entire comparison on the greater contemporaneity of the Indonesian data without considering its other criteria.  Without greater elaboration, the court cannot review the agency's rationale for finding Indonesia to be the primary surrogate country.

relative differences in data quality.  These findings are for Commerce to make in the first instance.  However, on remand, Commerce should consider all GNI data on the record in connection with its other findings relating to the selection of the primary surrogate country, including data considerations.  All these findings should be made with the ultimate goal in mind, valuing the respondents' factors of production using the best available information so as to calculate accurate dumping margins.

### B.  Primary Surrogate Country: Nonfish FOPs

Plaintiffs argue that Commerce's finding regarding the importance of non-fish FOPs was unreasonable.  Further, in analyzing the contemporaneity of these non-fish FOPs, Plaintiffs claim Commerce acted contrary to law.  Plaintiffs rely upon both of these arguments to challenge Commerce's selection on Indonesia as the primary surrogate country.  The court disagrees with Plaintiffs on its first challenge, but finds Plaintiffs have demonstrated that Commerce acted contrary to law in analyzing the contemporaneity of these non-fish FOPs.

### 1.  Importance of Non-Fish for FOPs

Plaintiffs argue that Commerce's reliance on the contemporaneity of nonfish factors in its primary surrogate country selection was not supported by substantial evidence. Specifically, Plaintiffs argue that Commerce's analysis regarding the significance of non-fish FOPs "failed to consider critical information" and thus was unreasonable.  Anvifish's & Vinh Quang's Br. 12.  Substantial evidence exists on the record when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373,

1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938)).  However, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp., 340 U.S. at 488.  Nevertheless, "the possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence on the record."  Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT __, __, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. at 488).  Substantial evidence also requires that Commerce "provide a 'rational connection between the facts found and the choice made . . . [and] articulate a satisfactory explanation for its action.'"  Baroque Timber Industries (Zhongshan) Co. v. United States, 38 CIT __, __, 971 F. Supp. 2d 1333, 1339-40 (2014) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

As discussed above, in NME proceedings, Commerce generally calculates NV "on the basis of the values of the factors of production utilized in producing the merchandise" together with "an amount for general expenses and profit plus the cost of containers, coverings and other expenses."  19 U.S.C. § 1677b(c)(1).  Commerce seeks "the best available information regarding the values of such factors . . . in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(1)-(4).  In making this determination, Commerce

prefers to value all factors in a single surrogate country.  See 19 C.F.R. § 351.408(c)(2).[18]

To select a primary surrogate country, Commerce examines whether a country is

economically comparable, a significant producer of comparable merchandise, and

whether information on the record from that country is suitable for valuing factors.  In

comparing data sources from different countries, it may be the case that one country

provides better data for one factor and a different country provides better data for another

factor.  Thus, when selecting which country should be the primary surrogate, Commerce

considers which factor(s) contribute the most to the NV calculation.

Here, unlike in past reviews, Commerce determined that nonfish factors were

important to the NV analysis stating that "factors other than whole fish and surrogate

ratios account for a significant portion of direct materials and NV . . . ." Decision Memo

10.  This conclusion was based on findings that Vinh Hoan was substantially integrated,

many Vietnamese exporters of subject merchandise had similar production experiences

to Vinh Hoan, and Vinh Hoan was one of the largest exporters of subject merchandise.[19]

See id. at 9.  Thus, Commerce explained that in addition to its comparison of the record

evidence for whole live fish and financial ratios, "the far greater contemporaneity and

---

[18] In its regulations, Commerce includes factors of production as well as other expense information in its definition of the terms "factors."  See 19 C.F.R. § 351.408(c) ("Valuation of Factors of Production. For purposes of valuing the factors of production, general expenses, profit, and the cost of containers, coverings, and other expenses (referred to collectively as "factors") under section 773(c)(1) of the Act the following rules will apply . . . .").

[19] Commerce explained that being substantially integrated means "produc[ing] an increasingly significant volume of whole fish for use in the production of subject merchandise." Decision Memo 9.

demonstrated importance to the NV calculation of the additional FOP [sic] available from Indonesia" supported its primary surrogate country selection. <u>Decision Memo</u> 27; <u>see also id.</u> at 10 (finding that with two exceptions all surrogate values for Indonesia were more contemporaneous than their Bangladeshi counterparts).

Commerce's determination regarding the importance of nonfish factors was in part based upon its analysis of Vinh Hoan, one of the two mandatory respondents, and one of the largest producers. <u>See</u> <u>Decision Memo</u> 9; <u>see also</u> Final Results Analysis Memorandum for Vinh Hoan 2, CD 261 at bar code 3124243-01 (Mar. 13, 2013). Anvifish, the other mandatory respondent, was not an integrated respondent as evidenced by Commerce not using any factors of production from the farming stage in the calculation of Anvifish's NV. Anvifish's & Vinh Quang's Br. 7; <u>see also</u> Preliminary Results Analysis Memorandum for Anvifish 5, CD 204 at bar code 3095040-01 (Aug. 30, 2012). Moreover, Anvifish and Vinh Quang argue, and Defendant fails to refute, that Commerce's statement that the other separate rate respondents were integrated like Vinh Hoan is unsupported. Nonetheless, the court cannot say that Commerce's conclusion regarding the importance of nonfish factors was unsupported by substantial evidence. Although Anvifish is one of the largest exporters, so is Vinh Hoan. Vinh Hoan is integrated, making nonfish factors more significant to Commerce's analysis. The question may be close, but the court cannot say that Commerce's finding is unreasonable.

Respondents below argued that Commerce should continue to "dismiss[ ] Petitioners' arguments concerning the valuation of" nonfish FOPs "because those inputs are minor." <u>Decision Memo</u> 9. Commerce chose not to treat nonfish FOPs as minor

because Vinh Hoan, as an integrated producer, produced "an increasingly significant volume of whole fish for use in the production of subject merchandise." <u>Decision Memo</u> 9.  Implicit in this statement is that even if other producers from Vietnam are not integrated, the fact that one of the largest producers is integrated makes nonfish factors of production more than a minor consideration.  While Commerce could have more explicitly acknowledged that its analysis did not depend on both mandatory respondents being integrated, the court finds that Commerce's determination to consider the nonfish FOPs "as a significant portion of direct materials and NV" is supported by substantial evidence.  See <u>Ceramica Regiomontana, S.A. v. United States</u>, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citations omitted).  Commerce selects a primary surrogate country in order to value the factors of production based on the best available information.  It is reasonable for Commerce to consider all the information that will be used to calculate NV under the NME methodology.  One of the two mandatory respondents is integrated and therefore nonfish factors will play a role in determining the NV for Vinh Hoan and the separate rate respondents through Commerce's separate rate methodology.

### 2.  Analysis of Nonfish FOP Data

Plaintiffs argue that in analyzing the data for non-fish FOPs Commerce acted contrary to law.  Commerce relied in part on the contemporaneity of nonfish factors of production data in making its primary surrogate country selection.  As discussed elsewhere in this opinion, Commerce prefers data that is "contemporaneous, publicly

available, tax and duty exclusive, representative of a broad market average, and specific to the input." Decision Memo 19 (citation omitted); see also Decision Memo 32 (discussing additional criteria including preferring non-export price averages and non-aberrational data).  However, here, in relying on FOPs other than whole live fish and surrogate ratios to make its primary surrogate country selection, Commerce stated that the majority of Indonesian surrogate values were more contemporaneous than Bangladeshi surrogate values. Decision Memo 10. Commerce's failure to analyze any of its other criteria makes its analysis of the data contrary to law.[20]  Indeed, this Court has on occasion explained that Commerce may not rely on contemporaneity alone in selecting what constitutes the best available information. See, e.g., Hebei Metals & Minerals Import and Export Corp. v. United States, 29 CIT 288, 300-01, 366 F. Supp. 2d 1264, 1274-75 (2005); see also Yantai Oriental Juice Co. v. United States, 26 CIT 605, 616-617 (2002). Thus, on remand, if Commerce continues to rely on factors other than whole fish to make its primary surrogate country selection, it must explain why Indonesian data for these nonfish FOPs are the best available information and not only credit their contemporaneity.[21]

---

[20] Commerce's failure to consider the relevant criteria caused it to disregard detracting evidence that it needs to address to satisfy the court that its determination is supported by substantial evidence.

[21] VASEP additionally argues that contemporaneity should not be dispositive because "with respect to labor, energy, transport, by-products and financial ratios, Bangladesh data is either equal to or more contemporaneous than the other data sources."  VASEP's Br. 58. Commerce should explain how it found that the majority of Indonesian surrogate

(footnote continued)

Here, Defendant responds that "Commerce examined the record data related to a number of factors of production – financial ratios, labor, sawdust, rice husk, fish waste, fish belly, fish skin, fish oil, fish meal, frozen broken meat, and fresh broken meat – to determine whether they satisfied Commerce's surrogate value criteria."  Def.'s Resp. 52-53 (citing Decision Memo 27-41).  Defendant's response misses the point of Plaintiffs' challenge.  Plaintiffs challenge Commerce's failure to meaningfully compare and evaluate the data from all countries based upon all the criteria.  Anvifish's & Vinh Quang's Br. 18-19.  To say that Commerce satisfied itself that the data met some minimum standard does not respond to the allegation that there has been no meaningful comparison of Indonesian and Bangladeshi data.  An examination of the Decision Memo reveals that Commerce did not evaluate criteria but often relied upon the fact that Commerce had chosen Indonesia as the primary surrogate country.  For example, Commerce selected an Indonesian company's financial statement to calculate financial ratios.  Decision Memo 27-30.  Commerce based this selection on its finding that the financial statement satisfied its criteria and was from the primary surrogate country.[22]

---

values were more contemporaneous than Bangladeshi data in light of VASEP's claim. VASEP goes on to argue that Bangladeshi data for nonfish FOPs and financial ratios is superior to Indonesian data for reasons other than contemporaneity.  As Commerce did not analyze factors other than contemporaneity for this data, the court cannot asses this claim.

[22] To say that the financial statement, or any other data, "satisfied its criteria" is to adopt a "check the box" approach.  In other words, Commerce would be able to prefer data from a particular country without any comparison amongst countries so long as the data satisfied some minimum requirement.  Given Commerce's reliance on the data to select the country in the first place, this approach is not consistent with Commerce's obligation to use the best available information to calculate accurate dumping margins.

Commerce declined to compare any other evidence on the record. For labor, Commerce selected Indonesian ILO Chapter 5B data. <u>Decision Memo</u> 30-31. It explained that although this data was not the most contemporaneous on the record, it satisfied all of the other criteria and was from the primary surrogate country. Commerce declined to compare any other record evidence. For sawdust, Commerce selected Indonesian GTA import data. <u>Decision Memo</u> 32. Commerce explained its selection by stating that Bangladeshi UN Comtrade data and price quotes were not as contemporaneous and there was information from the primary surrogate that satisfied its criteria. For rice husk, Commerce selected Indonesia GTA import data. <u>Decision Memo</u> 33-34. It explained that this data was from the primary surrogate country and satisfied its criteria. Additionally, Bangladeshi price quotes were not the best available information, "because, among other reasons, they are not contemporaneous . . . ." <u>Decision Memo</u> 34. For fish waste, fish belly, and fish skin, Commerce selected a price quote from a Philippine company. <u>Decision Memo</u> 35. For fish oil, Commerce selected Indonesian GTA import data, but determined to cap the value because of concerns that the tariff heading was overly broad. <u>Decision Memo</u> 37-39. It did not discuss this data in comparison to data from any other surrogate country, but did reject Indonesian price quotes as unreliable. For fish meal, Commerce selected Bangladeshi UN Comtrade data over an Indonesian price quote because it found the Indonesian price quote to be unreliable. <u>Decision Memo</u> 38-39. For frozen broken meat, Commerce selected Indonesian GTA data but did not compare the data to data from any other potential surrogate country. <u>Decision Memo</u> 39-40. For fresh broken meat, Commerce selected

a price quote from a Philippine company over Indonesian GTA data because the price quote was more specific.  <u>Decision Memo</u> 40-41.

As demonstrated by this summary, Commerce selected information from either the Philippines or Bangladesh for five of the eleven surrogate values cited by Defendant: fish waste, fish belly, fish skin, fish meal and fresh broken meat.  Additionally, for two of the six Indonesian based surrogate values, financial ratios and labor, Commerce did not compare the Indonesian data with data from other countries because it had data "from the primary surrogate country." <u>Decision Memo</u> 30, <u>see also</u> <u>id.</u> at 31. For sawdust and rice husk Commerce similarly relied on its practice of using data from the primary surrogate country, but also added that Indonesian data was more contemporaneous than Bangladeshi data.  For the final two surrogate values cited by defendant, frozen broken meat and fish oil, Commerce did not discuss data from any other country, presumably because no party argued for data from those countries below.  The only surrogate value for nonfish factors cited by Defendant that could potentially be construed to include a discussion of criteria other than contemporaneity is rice husk where Commerce chose Indonesian data over Bangladeshi data "because, <u>among other reasons</u>, they are not contemporaneous . . . ." <u>Decision Memo</u> 34 (emphasis added).  Commerce's use of the phrase "among other reasons" and its discussion of contemporaneity for one other factor cannot reasonably be considered to be comparison of Indonesian data with data from other potential surrogate countries.  Moreover, Commerce cannot both rely on nonfish factors to make its primary surrogate country and select the surrogate value for each

nonfish factor based on its primary surrogate selection.  That would be circular reasoning.  This is not enough to sustain Commerce's selection of Indonesia.

### C.  Primary Surrogate Country: Financial Ratios

As a separate matter, Anvifish and Vinh Quang challenge Commerce's selection of Indonesia as the primary surrogate country because Commerce's analysis of financial ratios is both contrary to law and unsupported by substantial evidence.  The court finds that Commerce's reliance on circular reasoning in selecting financial ratios undermines its primary surrogate country selection.  As for the Plaintiffs' arguments that the financial ratio analysis is not supported by substantial evidence, because Commerce relies on its primary surrogate country selection to choose the Indonesian financial statement as the best available information, the court must reserve consideration of this issue until Commerce's decision after remand.  Commerce must compare financial statements in the first instance.

Anvifish and Vinh Quang argue that Commerce's failure to compare financial statements from Indonesian and Bangladeshi companies made its surrogate country selection contrary to law. Anvifish's & Vinh Quang's Br. 19.  Defendant responds that Commerce did compare financial statements because it "regarded contemporaneity of Indonesian data for 'all [surrogate values]' an 'important factor' in its analysis."  Def.'s Resp. 53 (citation omitted).  Such a broad conclusory statement regarding surrogate values in general cannot be construed as a comparison.  Further, Defendant claims that "Anvifish has failed to demonstrate that it was unreasonable for Commerce to follow its regulatory preference for valuing all factors of production using reliable data from a single

country." Def.'s Resp. 53 (citation omitted).  By stating that it relies upon a comparison of financial statements in making its primary surrogate country selection and explaining that Indonesia provides the best available information to calculate financial ratios because it is from the primary surrogate country, Commerce has placed respondents on an administrative pendulum swinging back and forth between two explanations that rely on each other.

Commerce did not consider financial statements from Bangladeshi or Philippine companies "because [it had] a surrogate financial statement from the primary surrogate country which [met] the Department's SV selection criteria . . . ." Decision Memo 30. Commerce cannot base its primary surrogate country decision in part on financial statements but base its selection of a financial statement solely on its primary surrogate country selection.

### D.  Primary Surrogate Country Selection: Whole Fish

VASEP argues Commerce's conclusion that IAS data was superior to DAM Data for valuing the whole live fish input is unsupported by substantial evidence and contrary to law.  Moreover, Commerce's unsupported findings and legal errors regarding the IAS and DAM data undermined Commerce's primary surrogate country selection because Commerce's whole fish analysis was a major factor in Commerce's ultimate selection of Indonesia.  VASEP's arguments can be generally grouped into issues regarding whether the data sets are: (i) specific to the whole live fish input (i.e., similarity of the merchandise and industry covered by the data sets), (ii) contemporaneous, (iii) a broad market average, and (iv) reliable.  As an initial matter, given Commerce's obligation to evaluate

data in light of the relative economic comparability of the potential surrogate countries, the court cannot say whether Commerce's determination regarding the selection of Indonesia based on the superiority of Indonesian data is reasonable or in accordance with law.  Commerce must first address the court's concerns described above including whether any differences in the GNIs and their interaction with the data considerations will affect Commerce's selection.  Nonetheless, even if Commerce were permitted to examine data without reference to relative economic comparability, there are several problems that call into question the reasonableness and legal sufficiency of Commerce's analysis. Therefore, upon remand, Commerce should consider the issues discussed below when evaluating and comparing the data and relative economic comparability.

As discussed above, Commerce's policy where there is more than one country that is economically comparable and a significant producer of merchandise is to select "the country with the best factors data."  See Policy Bulletin 04.1.  Here, Commerce compared record information from the Philippines, Indonesia, and Bangladesh for the whole live fish FOP, eventually concluding that IAS data was the best available information.[23]

---

[23] Commerce also considered data for financial ratios and nonfish FOPs, but as discussed supra, the court cannot consider the reasonableness of Commerce's analysis of financial statements because Commerce did not attempt to actually compare financial statements. Similarly, for nonfish factors, Commerce did not conduct an analysis of relevant criteria but merely declared the contemporaneity of the Indonesian data to be superior.  The court cannot evaluate Commerce's analysis for reasonableness until it employs a methodology which accounts for the criteria relevant to the analysis.

The court also reserves judgment on Plaintiffs' arguments that the surrogate values chosen for financial ratios, labor, sawdust, rice husk, fish waste, fish belly, fish skin, frozen

(footnote continued)

VASEP argues that IAS data is less specific than DAM data because IAS data includes non-subject merchandise species of pangasius (i.e., jambal) and the Vietnamese industry is more comparable to Bangladesh's industry than to Indonesia's industry. See VASEP's Br. 30-36, 49-50.  VASEP argues that including jambal distorts the price for whole live fish in IAS data because jambal is higher priced than species which are subject to the dumping order, such as hypophthalmus.  Further, IAS data is distorted by including alternative aquaculture methods (i.e., cages, rice paddies, and floating nets) that are distinct from those used in Vietnam (i.e., ponds) because there are different cost structures for all of these methods.  VASEP also argues the Indonesian industry is distinct from Vietnam and Bangladesh because unlike farmers in those countries, farmers in Indonesia further process whole live fish before shipping the fish.  Also, Indonesia imports subject merchandise and exports only small amounts of subject merchandise whereas both Vietnam and Bangladesh export substantial amounts of subject merchandise. VASEP also argues that Commerce's concerns that DAM data was less specific than IAS data because DAM data included dead fish was not supported by substantial evidence.

---

broken meat, fresh broken meat and freight in were unsupported by substantial evidence. For each of these surrogate values, Commerce either explicitly states that it is basing its choice, in part, on its primary surrogate country selection, or its choice may be affected by a change in its choice of primary surrogate country. Therefore, the court must reserve its substantial evidence analysis for after Commerce has had the chance to reconsider its primary surrogate country selection consistent with this opinion.

Here, with respect to whole fish, and whether Commerce's preference for Indonesian data supports its selection of Indonesia as the primary surrogate country, Commerce made a comparison between the various potential sources on the record.  Thus, the court is able to evaluate whether Commerce's analysis was reasonable.

Finally, VASEP argues that prices from Indonesia are distorted by subsidies, which again

makes whole live fish grown in Indonesia less specific than whole live fish in Bangladesh.

Commerce addressed these arguments below. Regarding VASEP's argument

that the IAS data is distorted by inclusion of higher priced jambal, Commerce stated:

> [i]n this review, IAS officials have stated that there [sic] only two types of
> pangasius commonly grown in Indonesia, hypophthalmus and jambal, with
> hypophthalmus being the predominant species grown. In addition, IAS
> officials have stated that hypophthalmus grows in ponds and cages, while
> jambal grows in rivers. Therefore, by limiting the aquaculture area to ponds
> and cages, only pangasius hypophthalmus, and trace amounts of the
> pangasius hypophthalmus hybrid, are represented in the Indonesian AS
> data. There is no evidence that the inclusion of the pangasius
> hypophthalmus hybrid distorts prices significantly. In fact, because
> hypophthalmus and jambal sell at similar prices, it is reasonable to suspect
> that the hybrid would sell at similar levels and that the inclusion of any such
> prices in the data would not distort the reported prices significantly.

Decision Memo 24 (footnotes omitted). Commerce cited a statement from Director

General of Aquaculture Soebjakto ("Soebjakto Statement"), which was attached to an

affidavit submitted by petitioners, CFA Surrogate Value Data Submission Ex. 6 at Att. 5,

PD 335 at bar code 3106818-21 (Nov. 20, 2012) ("Sopaheluwakan Aff."), to support its

first two findings. To answer the question posed by Catfish Farmers of America, "[i]s

there any one pangasius species predominantly grown in Indonesia? (As we understand

by far, *Pangasius Hypophthalmus* is the predominant species produced in Indonesia. Is

it true?)," Director General Soebjakto responded "[y]es, it is true. Since 1980s, the

pangasius species predominantly grown is [hypophthalmus] widely raised in freshwater

ponds and cages culture. However, [] jambal which has better quality of flesh (texture and

colour) is developed since 2000s and grown in streams." In making the finding that

hypophthalmus and jambal sell at similar prices, Commerce cited the IAS Data, which Defendant explains shows similar prices for ponds and cages (presumed to be hypophthalmus) versus floating net (presumed to be jambal) in the IAS data.

To support its arguments, VASEP cites an affidavit from the Director General of Aquaculture during the POR, Ketut Sugama, indicating that the IAS data can include several pangasius species, including both hypophthalmus and jambal. See VASEP's First Surrogate Value Rebuttal Submission Ex. 19E, PD 212 at bar code 3081393-03 (June 14, 2012) ("Sugama Aff."). It also cites three articles relating to the cultivation of jambal in Indonesia, VASEP's First Surrogate Value Rebuttal Submission Exs. 19B, 19C, 19I, PD 212 at bar code 3081393-03 (June 14, 2012), and the Sopaheluwakan Affidavit as well as two other documents, to show that jambal is higher priced than hypophthalmus, VASEP's Post-Preliminary Surrogate Value Rebuttal Submission Exs. 6, 7A, PD 367-68 at bar code 3108726-03-04 (Dec. 4, 2012). Moreover, VASEP argues that Commerce's citation to the IAS data does not support its finding that hypophthalmus and jambal sell at similar prices.

Commerce addressed two of the articles VASEP argues support the assertion that jambal is grown in ponds. Commerce stated

> [r]egarding the argument that jambal is grown in ponds, we disagree. VASEP has cited two articles in support of this contention. One is a guide on how a fish farmer would go about qualifying for a program to grow jambal, and notes that jambal could be grown in ponds. We note that this article is dated to 2006 and does not indicate that jambal was grown in ponds during the POR. The second article cited by VASEP is a technical guide on how jambal could be grown in ponds and cages. We note that this article is dated to 2005 and does not indicate that jambal was grown in ponds during the POR. Due to the age of these articles, we find the IAS official's statement

> that jambal is grown in rivers to be more probative than the articles cited by VASEP in determining the aquaculture in which jambal is current [sic] grown in Indonesia.

Decision Memo 24-25 (footnotes omitted).  Moreover, Defendant in its brief to the court points out that the Soebjakto statement does not provide that jambal is higher priced than hypophthalmus, but rather provides that jambal "has better quality of flesh (texture and colour). . . ."  Soebjakto Statement ¶ 2.

The court's role is not to reweigh the evidence.  Nonetheless, it is unclear to the court how the Soebjakto statement that jambal "is developed since 2000s and grown in streams" means that jambal is grown exclusively in rivers using floating nets (as opposed to cages for example), or that jambal is not grown at all in ponds.  Commerce, relying upon the Soebjakto statement, assumes that jambal is grown exclusively in rivers and that cages are not used in rivers.  It then infers that jambal is only cultivated in floating nets while hypophthalmus is only cultivated in ponds and cages. Commerce then compares prices of products cultivated in floating nets to prices of products from cages and ponds and concludes that hypophthalmus and jambal are similarly priced.   It is difficult for the court to follow, without more explanation or evidence, how Commerce arrives at the assumptions, inferences, and conclusions that it does.  It is particularly difficult given that in the same statement upon which Commerce relies we are told that jambal "has better quality of flesh (texture and colour). . . ." Soebjakto Statement ¶ 2.  This statement suggests that the products would not be similarly priced, and therefore detracts from Commerce's ultimate conclusion based upon the assumptions and inferences.  Commerce should address these issues upon remand.

VASEP cites additional evidence to support its argument that IAS data is distorted (and therefore not specific) because Indonesia is a net importer of subject merchandise, much of which comes from Vietnam.  See VASEP's Post-Preliminary Surrogate Value Rebuttal Submission Exs. 4-5, PD 367 at bar code 3108726-03 (Dec. 4, 2012).  Along the same lines, VASEP also cites evidence showing that Indonesian farmers process fish before shipping it to processing facilities, see Sugama Aff. ¶ 8, which VASEP argues further distinguishes the industry in Indonesia from Vietnam.  VASEP argues Commerce failed to address these arguments.  Defendant argues in response that its obligation is to compare merchandise, not industries.  Def.'s Resp. 41 (citing Decision Memo 24). Although Defendant is correct that the statute directs Commerce to seek surrogate values from producers of comparable merchandise, its explanation is unresponsive to the argument that Plaintiffs are making.  There are several producers of comparable merchandise.  See Decision Memo 10 (finding Bangladesh, India, Indonesia, Nicaragua, Pakistan and the Philippines to all be significant producers of comparable merchandise). However, when Commerce compares the data from these producers, it is being asked to weigh the specificity of the competing data so as to determine the best available information on the record to value the input.  It is not clear to the court how Commerce has addressed VASEP's argument that data derived from countries that are producers of comparable merchandise, where the merchandise is produced in a manner most similar to the subject merchandise, is more specific. Commerce should address this argument on remand.

Finally, VASEP argues that Commerce's concerns regarding the inclusion of dead fish in the DAM data are unfounded.  VASEP argues that the evidence cited by Commerce to show dead fish are included in the DAM data, CFA's Submission of Rebuttal Factor Value Data Ex. 30, PD 194 at bar code 3081368-15 (June 14, 2012), does not in fact discuss the inclusion of live and dead fish in the DAM data.  Thus, all Commerce is left with is other evidence that there is dead fish sold in Bangladesh.  VASEP argues that Commerce's concerns are unreasonable in light of the evidence, an affidavit from a DAM official stating that DAM data does not include dead fish, VASEP's Surrogate Country Comments and First Surrogate Value Submission 13B, PD 143 at bar code 3076936-04 (May 23, 2012), and general information about the sale of dead fish in Bangladesh.

In addressing these arguments Commerce stated

multiple sources on the record indicate that dead fish may be included in the DAM Data. An affidavit detailing interviews of pangasius traders at two large markets, for which DAM reported data during the POR, notes that live pangasius transported from farms to the marketplace die during transit (in some cases the mortality rate is 50 percent), vendors sell live and dead fish at the markets side-by-side, and dead fish are sold at lower prices than live fish. An article published by the U.S. Agency for International Development indicates that up to 29 percent of the pangasius sold in Bangladeshi wholesale markets are dead, and that dead fish sell for less than live fish. Information placed on the record by VASEP indicates (1) that while precautions are taken to ensure that live fish are delivered to the processing plants, there is a two to three percent mortality rate for those fish; and (2) that live and dead fish are sold in wholesale markets.  Moreover, there are two competing affidavits on the record from DAM officials concerning whether dead fish are included in the DAM Data. One affidavit, submitted by Petitioners, indicates that dead fish have been included in the DAM Data. Another affidavit, submitted by VASEP and which concerns the DAM Worksheets, indicates that only live fish are included in the DAM Data. It is precisely because of this conflicting information that the Department requested that DAM clarify this issue.  However, although provided two opportunities in this administrative review, DAM did not respond to the

> Department's questions, nor did DAM respond to the Department's questions in the last review.  In this case, because DAM has not responded to the Department's questions concerning whether dead fish are included in the DAM Data, we cannot discern with certainty whether and to what extent the DAM Data represents prices only for whole live fish. The respondents have all indicated that they only consume live whole fish. Consequently, we do not find the DAM Data to be as specific as another source on the record. Moreover, because dead fish sell for less than live fish, we harbor concerns that the DAM Data may understate the price of the whole live fish FOP. As noted below, the Department does not have this concern with respect to Indonesian AS.

Decision Memo 22-23.

Based upon the record evidence and the explanation provided by Commerce, the court cannot say that Commerce's conclusion on this issue is unreasonable.  First, the court notes that while VASEP correctly claims that the evidence cited by Commerce to show that dead fish are included in the DAM data does not in fact discuss dead fish, Commerce appears to have inadvertently cited to the wrong exhibit.  Another exhibit, CFA's Submission of Rebuttal Factor Value Data Ex. 30, PD 202 at bar code 3081368-25 (June 14, 2012), appears to be what Commerce meant to cite, and it does discuss dead fish.  However, this typographical error aside, Commerce had evidence that led it to believe dead fish may have been included in the DAM data.  This possibility raised concerns for Commerce regarding the usefulness of this data.  Commerce sought further information from DAM to clarify, and DAM did not respond.   As a result, Commerce was not unreasonable in its conclusion that it could not "discern with certainty whether and to what extent the DAM Data represents prices only for whole live fish."  Decision Memo 23.

VASEP also argues that IAS data lacks specificity because the inclusion of prices from different levels of trade and for different sizes of fish distorts it.  VASEP's Br. 38-39, 41-42.  Commerce addressed these arguments below stating,

> [w]hile VASEP and Vinh Hoan argue that *Indonesian AS* does not contain size data, we note that none of the respondents are able to report their CONNUMs on a size specific basis, nor do they report purchases of whole live fish on a size-specific basis, thus, we do not find a lack of sizing information in *Indonesian AS* to be any less specific than data which does contain size data.
> . . .
> As we noted in the last review, it is uncertain the extent to which [using wholesale prices and not farmgate prices] is relevant in the surrogate valuation analysis. Surrogate valuation seeks to determine the price a respondent would pay for an input if it were to produce subject merchandise in the surrogate country, not necessarily what producers/sellers of the input in the surrogate country receive. Therefore, whether the *FAO FIGIS Data*, *DAM Data*, *Philippines FS* or *Indonesian AS* represents wholesale prices or farmgate prices is immaterial to our SV analysis.

Decision Memo 24-25.

With respect to the different levels of trade, VASEP cites the Sugama Affidavit, which provides that "[t]he prices for [pangasius] reflected in the IAS surveys are from the retail market channel and include markups by intermediary buyers/distributors from the farmgate prices."  Sugama Aff. ¶ 6.  VASEP acknowledges that the Soebjakto statement attached to the Sopaheluwakan Affidavit provides that IAS data is derived from "multiplication between the number of production and the average pangasius price at the farm gate level," but VASEP argues that the Sugama Affidavit is more probative because he was in charge of collecting the IAS data for the relevant POR, and Soebjakto was only in charge afterwards.  VASEP argues that at the very least, it is unclear whether the IAS data is derived from farmgate, wholesale, or a blend of prices, whereas DAM data prices

are categorized under grower, wholesaler, and retail market segments.  This distinction, according to VASEP, weighs in favor of selecting DAM data.

VASEP does not explicitly argue that the ability to distinguish levels of trade in the data is important for identifying accurate surrogate values.   It simply argues that the DAM data is better than the IAS data because it gives Commerce the ability to choose prices from different levels of trade.   Commerce explains that it does not need to distinguish between the different levels of trade and VASEP has not refuted this contention. Therefore, the court cannot say that Commerce's determination on this issue is unreasonable.

With respect to the sizes of fish, VASEP argues that Commerce defines CONNUMS by weight (band)-size of the fish and that all factors of production are based on the size of the end product.  However, as Commerce explained, respondents do not "report purchases of whole live fish on a size-specific basis . . . ."  Decision Memo 24. Since respondents do not report the input by size, it is unclear why data that includes the price of the input broken down by size is more specific in any way that is relevant to valuing whole live fish.  Thus, Commerce's finding is not unreasonable.

Finally, VASEP argues that the IAS prices are less specific because various subsidies the Indonesian government provides to the pangasius industry distorts them. VASEP cites VASEP's First Surrogate Value Rebuttal Submission Ex. 19G, PD 212 at bar code 3081393-03 (June 14, 2012), which provides a list of subsidies provided to the fishing industry in Indonesia.  VASEP also cites information which it argues shows the Indonesian Ministry of Marine and Fisheries Affairs provides various assistance to small

farmers, VASEP's Post-Prelim Surrogate Value Rebuttal Submissions Ex. 2, PD 365 at

bar code 3108726-01 (Dec. 4 2012), and information it argues shows various loan or

credit programs, VASEP's First Surrogate Value Rebuttal Submission Ex. 19A, PD 212

at bar code 3081393-03 (June 14, 2012).

Commerce addressed the issue of whether subsidies affected the IAS data below

stating,

> it is the Department's practice to exclude data from consideration only when
> the record evidence demonstrates that the alleged subsidy programs
> constituted subsidies found countervailable by the U.S. government in a
> trade remedy proceeding. In this case, as we have found in prior segments,
> there is no record evidence that the alleged subsidies constitute
> countervailable subsidies.

Decision Memo 20 (footnotes omitted).  VASEP argues that Commerce's explanation was

contrary to Congressional intent, its own policy, and was thus contrary to law.  VASEP

cites the Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. 100 576, at 59

(1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24; Folding Metal Tables and Chairs

from China, 67 Fed. Reg. 20,090, 20,093 (April 24, 2002) (notice of final determination of

LTFV); Issues and Decision Memorandum for Tapered Roller Bearings and Parts Thereof

from the People's Republic of China Cmt. 1, A-570-601, (Nov. 15, 2001), available at,

http://enforcement.trade.gov/frn/summary/prc/01-28651-1.txt (last visited February 12,

2015).  While Commerce may have previously found distortion by virtue of subsidies in

the absence of an affirmative countervailing duty finding in a U.S. trade remedy

proceeding, it did so under very different circumstances. Commerce was not

unreasonable in finding that the record here did not support a finding in this case that Indonesian data was distorted by subsidies.

VASEP challenges the contemporaneity of IAS data as compared to DAM data and argues that Commerce erred by not giving any weight to the fact that DAM data precisely coincided with the POR whereas IAS data consisted of data 7 months prior to the POR, the entire POR, and 5 months after the POR.[24]   Rejecting this argument Commerce explained, "we consistently have recognized that data sources which overlap part of the POR are considered contemporaneous."   Decision Memo 19 (footnote omitted).  Defendant further argues that "the statute does not require Commerce to use the 'most-contemporaneous' data in deciding which data represents the 'best available information.'"  Def.'s Resp. 34 (citing 19 U.S.C. § 1677b(c)(1)).  Defendant further argues that this practice has been judicially affirmed.  Id. (citing Shieldalloy Metallurgical Corp. v. United States, 20 CIT 1362, 1371 947 F. Supp. 2d 525, 534 (1996)).

The court agrees with the Defendant that the statute does not require Commerce to use the most contemporaneous data.  However, finding that data is contemporaneous in some regard is different from saying that the two periods at issue here are equally contemporaneous.   On remand, Commerce should weigh the DAM data's greater

---

[24] The reason for this is that DAM data provides monthly prices and thus Commerce can use the months that match up exactly with the POR.  In contrast, the IAS data represents yearly averages for 2010 and 2011 thus, each year inherently includes data outside the POR (i.e., 2010 includes data for 7 months prior to the POR, January through July, and 2011 includes data for 5 months after the POR, August through December).

contemporaneity when comparing the two data sets and determining which set is the best available information.

Next, VASEP argues that Commerce's concerns regarding whether DAM data represented a broad market average and its finding that IAS is a broader market average than DAM data are unfounded.  VASEP states that in comparison to the weekly price points of two sizes of pangasius in the DAM data, IAS data provides estimated annual figures calculated from sample surveys of a small group of selected respondents.  VASEP further argues that the availability of weekly price points in DAM data makes the data qualitatively better and "prone to more sophisticated analysis and review."  VASEP's Br. 51.  VASEP also argues that the absence of the Mymensingh region from the online DAM database does not detract from the broadness of the DAM data because the record contains hard copy DAM data for Mymensingh.  VASEP argues that Commerce should not totally discount the hard copy DAM data as not publicly available because Commerce did not point out any distortion caused by the hard copies not yet being published in the online database.  Moreover, VASEP states that the DAM data still accounts for 27 districts in the country even without the hard copy data.  Finally, VASEP argues that Commerce's determination was contrary to law because it was inconsistent with a recently completed new shipper review covering the same subject merchandise.

Commerce did not find that the DAM data does not represent a broad market average.  Decision Memo 21.  On the contrary, Commerce found that IAS data represents a broader market average than DAM data, comparatively speaking, based upon a

comparison of the district and data coverage for the IAS and DAM data.  Its finding, in light of the record evidence, is reasonable.[25]

Finally, VASEP argues that the record reveals the IAS data was unreliable and that Commerce's concerns with regard to the reliability of DAM data are unfounded. VASEP argues that IAS data is unreliable because it is not based on actual sales prices and contains mistakes and inaccuracies.  Moreover, it claims Commerce's suggestion that DAM data may be unreliable because of a difference between the weekly and yearly averages is unsupported.  Commerce addressed these arguments below explaining that with respect to price fluctuations in the data,

> the DAM Data and Indonesian AS both have price fluctuations. With the exception of one area representing an insignificant quantity, the highest price in the DAM Data is roughly twice as high as the lowest price. However, this is to be expected in different markets with different supply, demand, and logistical characteristics. VASEP cites to a shrimp from the PRC review as evidence that the Department conducts standard deviation tests when comparing SVs. In that case we noted in the SVs memorandum that an interested party conducted a standard deviation and we found that the standard deviation contributed to our finding that a certain shrimp feed SV was aberrational. However, we did not rely upon the standard deviation in the PRC Shrimp Final. As a result, we do not find that any of the live whole fish SV choices discussed above to be anomalous with regard to price variances and, thus, consider all sources equal in this regard.

Decision Memo 26 (footnotes omitted).  Moreover, with respect to DAM data, Commerce

> found that it contains price differences between the weekly and yearly averages. For example, the POR yearly price for *pangasius* (small) from

---

[25] The court notes that Commerce was able to compare the data from Indonesia and Bangladesh with respect to its broad market average criteria.  This is precisely the type of comparison that Commerce did not do with respect to contemporaneity of IAS and DAM data and which it should do on remand.

> Tangail is 7,220 Bangladeshi taka, while an average of the POR weekly prices is 7,019 Bangladeshi taka. It is because the Department is uncertain as to what, if any, procedures are used by DAM to ensure its data accuracy, that the Department requested information from DAM concerning its collection and collation methods; however, DAM did not respond.

Id. (footnotes omitted).  In contrast, with respect to IAS data, Commerce did "not have the same concerns . . . ." Id.  Commerce explained that

> [d]ata of *pangasius* production is collected in stages at the household, village, and municipal level, using random sampling to determine the surveyed villages and households which conduct *pangasius* aquaculture activities. Moreover, IAS officials indicate that they do make revisions and corrections to data when necessary. For example, IAS officials acknowledged an error with regard to the 2010 paddy aquaculture area, an area which the Department has not used to calculate the whole live fish SV.

Id. at 26-27 (footnotes omitted).

First, VASEP argues that Commerce violated a preference for "actual price data alone," which VASEP says is akin to DAM data, as opposed to "extrapolated estimated averages" which VASEP says is akin to IAS data.  VASEP's Br. 36.  It cites Commerce's rejection, in the 5th administrative review, of a potential surrogate value for whole live fish derived from total value and production data in a thesis.  Id.  Defendant responds that this argument is non-responsive to Commerce's reliability analysis below and ignores the fact that each segment of a proceeding is sui generis.  Def.'s Resp. 48-49.  Moreover, Defendant argues that the Federal Circuit has affirmed Commerce's use of data based on averages.  Id. at 49 (citing Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1322 (Fed. Cir. 2010)).

Next, VASEP argues that IAS data contains mistakes and inaccuracies, a point VASEP says IAS acknowledges.  To support this contention, VASEP cites an email

exchange between counsel and IAS staff members, VASEP's Post-Prelim Surrogate Value Submission Ex. 1, PD365 at bar code 3108726-01 (Dec. 4, 2012), which acknowledges errors in the IAS data.  Additionally, VASEP argues that IAS data contains statistical anomalies which it argues are demonstrated by several exhibits which it attached in its post-preliminary rebuttal case brief.  See VASEP Post-Preliminary Rebuttal Case Brief Exs. 2(a)-(b), 3(a)-(d), 4(a)-(b), PD 416, at bar code 3114445-04 (Jan. 11, 2013).

Finally, VASEP argues that Commerce's concerns with respect to the reliability of DAM data are unsupported and that any concerns should be allayed by the extensive corroborating evidence on the record.  VASEP's Br. 54-56.  VASEP argues that Commerce's findings that "a nearly doubling of prices between districts" presents no reliability problem but that "a mere 3% deviation in prices" between weekly and yearly averages does present a reliability problem, are contradictory.  Id. at 54.  Moreover, VASEP argues that Commerce's concerns that the DAM data is not carefully vetted is contradicted by the relative stability of the prices in hundreds of data points throughout the POR.  VASEP also points to various evidence which it argues supports that the DAM data is, in fact, carefully vetted.  See VASEP's Surrogate Country Comments and First Surrogate Value Submissions Ex. 13A-13C, PD 143 at bar code 3076936-04.  Finally, VASEP cites record evidence which it argues corroborates the DAM prices, VASEP's Surrogate Country Comments and First Surrogate Value Submission Ex. 15A at p. 22, 15B, 16A at p. 25, 16B, 17A, PD 143 at bar code 3076936-04 (May 23, 2012) and explains that there is no such corroborating evidence for the IAS prices.

VASEP's arguments are unpersuasive. With respect to both VASEP's arguments regarding the use of actual price data and the lack of a standard deviation analysis, VASEP has not established that either is required to ensure reliability.  Commerce has broad discretion in assessing the reliability of the data.[26]  Further, Commerce's finding that it had unanswered questions about the DAM data is supported by the fact that DAM did not respond to its queries.

On remand, when Commerce undertakes its comparison of Bangladesh and Indonesia with respect to differences in economic comparability and differences in data considerations, Commerce should address the court's above-stated concerns with Commerce's whole live fish analysis.

## III.   Surrogate Values

### A.  Legal Framework for Valuing Factors of Production

Again, in NME cases, Commerce constructs NV by valuing factors of production that are used to produce the subject merchandise and adding "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).  Commerce must value the factors of production "based on the best available information regarding the values of such factors in a market economy

---

[26] The court notes that there does appear to be a significant anomaly with respect to Sumatra Region Lampung locality in 2010 cage culture. See IAS Data 2010 at pp. 43, 46; VASEP Post-Preliminary Rebuttal Case Brief Exs. 2(a), PD 416 at bar code 3114445-04 (Jan. 11, 2013).  The court's standard of review precludes it from reweighing the evidence, but it is possible that Commerce may decide on remand that excluding cage data would improve the accuracy of the respondent's margins in light of the court's discussion of jambal above.  Alternatively, if Commerce does not exclude cage data it must explain the anomaly and its conclusion that the IAS data is nonetheless reliable.

country or countries." Id.  When calculating NV, Commerce "may offset production costs incurred by a respondent with the sale of by-products generated during the production process."  Decision Memo 34 (citing 19 U.S.C. § 1677b(c); Guangdong Chems. Imp. & Exp. Corp., 30 CIT 1412, 1422, 460 F.Supp.2d 1365, 1373 (2006)); see also Tianjin Magnesium Intern. Co., v. United States, 34 CIT __, __, 722 F.Supp.2d 1322, 1336 (2010) (explaining that "[t]he antidumping statute does not prescribe a method for calculating byproduct offsets instead leaving the decision to the technical expertise of the Department.").  Commerce has broad discretion in deciding what constitutes the best available information because the term is not defined in the statute.  See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  However, Commerce must ground its selection of the best available information in the overall purpose of the AD statute, calculating accurate dumping margins.  See CS Wind Vietnam Co., Ltd. v. United States, 38 CIT __, __, 971 F.Supp.2d at 1277 (citing Rhone Poulenc, Inc., 899 F.2d at 1191; see also Parkdale Inten., 475 F.3d at 1380.

### B. Factors of Production

Plaintiffs make other challenges to Commerce's findings including challenges to the financial ratios, labor, sawdust, rice husk, fish waste, fish belly, fish skin, frozen broken meat, fresh broken meat, and "freight in" for the selling, general and administrative ("SG&A") expense ratio.  For all of these issues, Commerce has either relied in part upon the selection of the primary surrogate country, or if Commerce were to select a different primary surrogate country upon remand it might consider the selection of the primary surrogate country in its analysis.  Likewise, Commerce's analysis of the inland freight and

brokerage and handling calculation is contingent upon its primary surrogate country selection.   Therefore, the court reserves judgment on all issues pertaining to the values of the factors of production in this case until after remand.

### C.  Fish Oil Byproduct Offset

Defendant requests a voluntary remand to reconsider its calculation of Vinh Hoan's byproduct.   "Generally, a request for a voluntary remand due to substantial and legitimate agency concerns should be granted."   <u>Timken Co. v. United States</u>, 38 CIT __, __, Slip Op. 14-51, *5 (May 2, 2014) (citing <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1029 (Fed. Cir. 2001)).   "Commerce's concerns are substantial and legitimate when (1) commerce has a compelling justification for the remand, (2) the justification for remand is not outweighed by the need for finality, and (3) the scope of the remand is appropriate." <u>Timken Co.</u>, Slip Op. 14-51 at *5 (citing <u>Ad Hoc Shrimp Trade Action Comm.</u>, 37 CIT __, __, 882 F.Supp.2d at 1381).

Defendant justifies its remand request by explaining Commerce "used the methodology to calculate Vinh Hoan's by-product for the first time in the *Final Results*" and it did not have "the opportunity to consider [the parties'] arguments in the first instance" outside the ministerial error context.   Def.'s Resp. at 80.   Thus, if Defendant were to address the parties' arguments here, it would amount to "impermissible *post hoc* rationalization."   <u>Id.</u>  Although Defendant does not concede error, both Vinh Hoan and Catfish Farmers of America have raised several issues with the fish oil calculation and byproduct offset.   Here, the justification for remand is not outweighed by the need for finality especially where both Vinh Hoan, a mandatory respondent in the administrative

proceeding, and Catfish Farmers of America, a petitioner in the administrative proceeding, have challenged Commerce's fish oil calculation and byproduct offset methodology. <u>See</u> Vinh Hoan's Br. at 7-19; Catfish Farmers of America's Br. at 17-25. Thus, parties on both sides of the proceedings are seeking a remand on the very issue that the Defendant is making its request for voluntary remand.  Moreover, no party objected to the Defendant's request in their replies.  Defendant's request for voluntary remand is granted.

## IV.     Consignment Sales

Commerce valued Vinh Hoan's credit expenses and inventory carrying costs for its CCEP sales using facts available because it found at verification that "Vinh Hoan calculated the credit expenses for its CCEP sales in the same manner as CEP sales, despite the fact that the shipping dates for the two types of sales differed."[27] <u>Decision Memo</u> 52.  Commerce calculated credit expenses for CCEP sales "using an average of the days between the dates of shipment from inventory to the date of payment, calculated from the sales traces observed at verification" and inventory carrying costs for CCEP sales "using the average of the days between the date Vinh Hoan's merchandise cleared customs and the date they of shipment [sic] from warehouse." <u>Id.</u>  Vinh Hoan argues that

---

[27] CCEP sales refer to consignment constructed export price sales, a variation of constructed export price sales made on consignment.  Constructed export price "means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . ."  19 U.S.C. § 1677a(b).

Commerce improperly applied facts available to all sales to a specific customer despite

"not all sales to that customer [being] consignment sales."  Vinh Hoan's Br. 52.

Vinh Hoan challenged this result in its ministerial error comments, but Commerce

declined to make the requested change.  See Ministerial Error Allegation Memorandum

7, PD 466 at bar code 3136028-01 (May 9, 2013) ("Ministerial Error Allegation

Memorandum").  Specifically, Commerce explained:

> We disagree with Vinh Hoan.  As we stated in Comment IX of the *Final
> Results* I&D Memo, we used facts available to calculate these expenses.
> Thus, the application of these expenses to one of Vinh Hoan's customers
> was an intentional methodological decision and, therefore, does not
> constitute a ministerial error pursuant to section 751(h) of the Act and 19
> CFR 351.224(f).

Id. at 7.[28]

Commerce does not explain in its Decision Memo or its Ministerial Error Allegation

Memorandum its decision to treat all the sales to one customer as if they were

consignment, and thus CCEP sales.  In its Decision Memo, Commerce merely explains

how it treats Vin Hoan's CCEP sales, it does not identify which sales it treated as CCEP

sales.  Decision Memo 52 (explaining that "[f]or these final results, as facts available, the

Department has valued Vinh Hoan's credit expenses for its CCEP sales using an average

of the days between the dates of shipment from inventory to the date of payment,

calculated from the sales traces observed at verification.").  In response to Vinh Hoan's

ministerial error comment that Commerce had mistakenly identified all sales to one

---

[28] Commerce's reference to "Comment IX" is meant to refer to Comment XII of the
Decision Memo where Commerce discussed "Vinh Hoan's Imputed Expenses for
Constructed Export Price."

customer as CCEP sales, Commerce asserted that it made a methodological choice, not a mistake. <u>See</u> Vinh Hoan Ministerial Error Comments at 3-4, CD 266 at bar code 3125191-01 (Mar. 20, 2013); Ministerial Error Allegation Memorandum 7.  If this was indeed Commerce's choice, then Commerce needs to explain why its choice was reasonable in light of the fact that there is record evidence that clearly demonstrates that not all of Vin Hoan's sales to the one customer were CCEP sales.  The court remands this issue to Commerce to reconsider its decision to treat all sales to one customer as consignment sales or explain why it is doing so despite record evidence that only some sales to such customers were consignment sales.

## V.    Inclusion of Sample Transactions

Vinh Hoan argues that Commerce improperly included sample transactions with positive gross unit prices in Vinh Hoan's margin calculation.  Vinh Hoan Br. 51.  Vinh Hoan devotes only three sentences to this argument asking the court to remand the decision because "these transactions should have been excluded from the margin calculation."  <u>Id.</u>  Commerce rejected this argument in its Ministerial Error Allegation Memorandum explaining that it "does not exclude sales from the margin calculation unless a party provides a compelling reason to do so" and here "Vinh Hoan provided the Department with no such reasoning."  Ministerial Error Allegation Memorandum at 8 (citation omitted).  Commerce's determination was reasonable and is affirmed.

## VI.    Net vs. Gross Weight Adjustment

Catfish Farmers of America argue that Commerce's refusal to make an adjustment to Vinh Hoan's NV was not supported by substantial evidence and was otherwise not in

accordance with law. More specifically, Catfish Farmers of America argue that Commerce's determination was not supported by substantial evidence because it did not adequately explain why it would not adjust Vinh Hoan's FOP data.  Additionally, Catfish Farmers of America argue that Commerce's determination was contrary to its past practice in prior reviews.  Given the record before the court and Commerce's past practice, Commerce has failed to adequately explain how its refusal to adjust Vinh Hoan's NV is reasonable and makes a fair comparison as required by the statute.

Commerce conducts administrative reviews to "review, and determine . . .  the amount of any antidumping duty" by calculating "the normal value and export price . . . of each entry of subject merchandise, and the dumping margin for each such entry."  19 U.S.C. § 1675(a).  The AD statute defines the term "dumping margin" as "the amount by which normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  "[A] fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).  As discussed above, in NME cases, NV is determined "on the basis of the value of the factors of production utilized in producing the merchandise . . . ."  19 U.S.C. § 1677b(c)(1)(B).

Here, Commerce selected Vinh Hoan as one of two mandatory respondents for the eighth administrative review.  See Preliminary Results at 56,180.  Responding to Department questionnaires, Vinh Hoan explained that it used its reported gross quantity of tra product in kilograms as its denominator to value most of its FOPs.[29]  See Vinh

---

[29] The gross quantity of tra product refers to Vinh Hoan's total production of glazed and unglazed merchandise sold worldwide, which Commerce required Vinh Hoan to report.

Hoan's Section D QR at 4, 9, CD 59 at bar code 3049386-01 (Jan. 3, 2012).  FOPs were

then calculated on a US dollar to kilogram basis (USD/kg).

At verification, Commerce discussed glazing with Vinh Hoan company officials.

Glazing is a process that adds weight to frozen fish fillets by "coating the finished fish fillet

with water and then freezing it."   Catfish Farmers of America's Br. 6-7.   In its report,

Commerce stated

> [w]e inquired as to whether the company's net price includes glazing.
> Company officials indicated that net price does not include glazing.
> Company officials confirmed that U.S. products did not include glazing
> during the POR, but other products sold that were included as part of the
> denominator did include glazing.

See Verification of Vinh Hoan Export Price at 16, CD 249 at bar code 3110869-01 (Dec.

17, 2012).   In other words, Vinh Hoan's net sales price did not include glazing, Vinh

Hoan's U.S. products price during the POR did not include glazing, however some of the

sales that were included in the denominator used to calculate FOPs did include glazed

sales.   Commerce also conducted a "deglazing test" on one box of merchandise.   See id.

at 45.   After the test was completed the officials observed and recorded the difference in

weights between the net weight and gross weight of the fish.   Id.   Vinh Hoan also reported

that "the subject merchandise [it] sold [] did not include ice, water, glazing, etc. weight."

Vinh Hoan's Section C Questionnaire Response at 9, CD 72 at bar code 3049432-01 (Jan

3, 2012).   Vinh Hoan reported the total quantity consumed of a given factor in kilograms

for production of all tra products during the POR and divided that number by the total

quantity of finished tra products on a kilograms basis.   This created a ratio which

represented the kilograms consumed of the factor per kilogram of finished product.   See,

e.g., Vinh Hoan's Third Supplemental Questionnaire Response at Ex. 1, CD 183 at bar code 3090578-01 (Aug. 2, 2012) (showing Vinh Hoan's reported whole fish consumption and ratio).[30]   In other words, Vin Hoan reported its FOPs using a gross weight denominator (a denominator that included the weight of glazing), and although it sold glazed tra elsewhere, it did not sell any glazed tra in the United States.

Commerce rejected Catfish Farmers of America request for an adjustment to Vinh Hoan's FOP data explaining that "Vinh Hoan's U.S. sales are reported on a gross weight basis . . . [but] [b]ecause none of Vinh Hoan's U.S. customers requested ice, water, or glazing, its reported net weight and gross weight were the same."   Decision Memo 48. Moreover, Commerce explained, "Vinh Hoan reported . . . that its factors products were reported on a gross weight basis . . . ."   Id.   Commerce discussed its analysis from the second administrative review.  Finally, it explained that "because the NV and U.S. price were [sic] data were both reported on a gross weight basis, the relevant basis of comparison is consistent; therefore, no adjustment is necessary or warranted."   Id.

Commerce's determination is not supported by substantial evidence.   Catfish Farmers of America, has demonstrated with record evidence below that (1) Vinh Hoan's U.S. sales did not include any glazed sales; and (2) each factor ratio reported by Vinh Hoan was calculated with a denominator that includes glazed weight. Commerce has not

---

[30] For example, to determine the whole fish input FOP on a USD/kg basis, the gross quantity of whole fish consumed during the POR, in kilograms, was divided by the total aggregate quantity in kilograms of all tra products sold during the POR.  This ratio was then multiplied by the surrogate value selected by Commerce for whole fish.  This method was repeated for each FOP.

provided an adequate explanation for why no adjustment is necessary to make a fair comparison or why it cannot make such an adjustment.  No party disputes that for Vinh Hoan's U.S. sales the net and gross weights are equal.  No party disputes that Vinh Hoan reported its FOPs on a gross weight basis.  The explanation Commerce has provided misses the point and does not explain why Commerce should not make an adjustment.  Commerce has not credited some facts over others.  Instead, Commerce has ignored facts cited by Catfish Farmers of America, and responded to petitioner's arguments by reciting undisputed facts.  The substantial evidence standard requires more than this.  It requires that Commerce "provide a 'rational connection between the facts found and the choice made . . . [and] articulate a satisfactory explanation for its action.'"  Baroque Timber Industries, 38 CIT __, __, 971 F. Supp. 2d at 1339-40 (citing Burlington Truck Lines, Inc., 371 U.S. at 168; Yangzhou Bestpak Gifts & Crafts Co., 716 F.3d at 1378).  Here, Commerce has not done so.

In the original investigation Issues and Decision Memorandum, Commerce explained that for the preliminary results it compared a respondent's U.S. sales on a net weight basis to the factors of production on a gross weight basis.  Issues and Decision Memorandum for Certain Frozen Fish Fillets from the Socialist Republic of Vietnam 4,  A-552-801,        (June        16,        2003),        available        at http://enforcement.trade.gov/frn/summary/vietnam/03-15794-1.pdf (last visited February 12, 2015) ("Investigation Decision Memo").  After comments from the parties, Commerce decided to make adjustments to the FOPs and to compare the U.S. sales and FOPs both on a net weight basis in a post-preliminary determination.  Id.  For the final results,

Commerce obtained more information and made its comparison on a gross weight to gross weight basis.  Id.  It explained that its practice is to compare FOPs on the basis that respondents sell their products in the U.S. market and thus, it preferred a comparison on a gross weight basis because that was how the respondent made its U.S. sales.  Id. at 5. In the investigation, respondents reported their U.S. prices on both net and gross weight bases, but where the net and gross weights were equal, there was no distinction made between the net and gross weights.  Id. at 4 nn.7, 8.  This fact indicates that both glazed and unglazed sales were made to the U.S. during the POI.  It is unclear if the same rationale used in the investigation would apply to this review where Vinh Hoan has not made any glazed sales to the U.S. market.  The U.S. sales were, in effect, reported on both a net weight and gross weight basis because as Commerce has explained, in this review, gross and net weight were the same for the U.S. sales.  Commerce must provide a rational explanation on remand for its choice to use a ratio with a denominator that includes glazing weight despite the fact that there were no glazed sales made to the US market.

In its discussion of the second administrative review, Commerce again misses the point.  In that review, one of the respondents argued for an upward adjustment of its U.S. price, which had been reported on a net weight basis, by the glazing percentage, so that U.S. price and NV would be compared on the same basis.  Commerce rejected the requested adjustment finding that both companies had reported their FOPs on a net weight basis, the same basis on which the respondents had reported their U.S. price. Commerce further explained that although respondents had reported glazing water and

electricity as FOPs, no adjustment was required because it did not affect the per unit basis of comparison by making inconsistent denominators.[31]   Here, Commerce explains that the facts are different because the U.S. prices and NVs were both reported on a gross weight basis.   Presumably, under Commerce's current rationale, if Vinh Hoan had reported its U.S. sales on a net weight basis, which is the same weight reported here, Commerce would have made an adjustment to the FOP data.  Relying on the word used by Vinh Hoan, either net or gross is simply not substantial evidence.   Again, here the denominators can only be considered consistent if we ignore the evidence showing, (1) there are no glazed U.S. sales; and (2) there are glazed sales in the FOP denominator. Commerce's explanations in its past investigation and reviews make clear the reason for an adjustment is that inconsistent denominators lead to a distorted picture because Commerce compares a ratio based upon one type of sale, i.e., glazed (also known as a gross sale) when the US sales were actually of another type, i.e., unglazed (also known as a net sale). The relevant question is whether the denominators represent the same type of sale: glazed or unglazed.  The fact that sometimes a net weight sale and a gross weight sale would be the same because there were no glazed sales does not alter the fact that there were two different types of sales made.  Thus, Commerce must consider this evidence on remand and either make an adjustment that is supported by the record

---

[31] The court notes that the circumstances of this case appear to be what Commerce described in the 2nd Administrative Review.  The per unit basis of comparison is affected by a denominator for U.S. sales with no glazed weight and a denominator for NV that includes glazed weight.

or articulate a rational explanation for why no adjustment is necessary or cannot be made.[32]

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's decision regarding sample sales is sustained; it is further

**ORDERED** that Commerce's primary surrogate country selection is remanded for further consideration consistent with this opinion; it is further

**ORDERED** that Commerce's refusal to adjust NV is remanded for further consideration consistent with this opinion; it is further

**ORDERED** that Commerce's use of facts available for all sales to one customer as opposed to all CCEP sales is remanded for further consideration consistent with this opinion; it is further,

---

[32] At oral argument, counsel for the government argued that Commerce's path was reasonably discernable.  Counsel explained that Commerce did not have evidence which would allow it make an adjustment.  Moreover, counsel explained that the lack of evidence in this review makes the review distinguishable from times when Commerce had made an adjustment in the past.  While Commerce did note that "Vinh Hoan reported . . . its factors products were on a gross weight basis . . . [and] that all of its production facilities use water in the production process," <u>Decision Memo</u> 48, Commerce did not explain that it could not make an adjustment based on the way the information was reported, or why allowing for a distortion to the denominator was more accurate than leaving potential distortions in the numerator.  Further, Commerce specifically analogized this review to the second administrative review after explaining that in the second administrative review no adjustment was necessary because the per unit basis of comparison was not based on inconsistent denominators.  Here the denominators are inconsistent.  The court cannot say that Commerce's path was reasonably discernable.

**ORDERED** that Commerce's fish oil calculation is remanded in accordance with Commerce's request; it is further,

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; it is further,

**ORDERED** that the parties shall have 30 days thereafter to file objections; and it is further,

**ORDERED** that the Government and Defendant-Intervenors shall have 15 days thereafter to file responses.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: February 19, 2015
New York, New York