**Slip Op. 16-53**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VINH HOAN CORPORATION ET AL., | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| BINH AN SEAFOOD JOINT STOCK COMPANY, | |
| **Plaintiff-Intervenor and Consolidated Plaintiff-Intervenor,** | **Before: Claire R. Kelly, Judge** |
| v. | **Consol. Court No. 13-00156** |
| UNITED STATES, | **Public Version** |
| **Defendant,** | |
| **and** | |
| CATFISH FARMERS OF AMERICA ET AL., | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

### OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's: (1) remand redetermination in the eighth antidumping duty administrative review of certain frozen fish fillets from the Socialist Republic of Vietnam; and (2) remaining determinations from the eighth antidumping duty administrative review of certain frozen fish fillets from the Socialist Republic of Vietnam.]

Dated: May 26, 2016

Matthew Jon McConkey, Mayer Brown LLP, of Washington, DC, for plaintiff and defendant-intervenor Vinh Hoan Corporation.

Andrew Brehm Schroth, Ned Herman Marshak, and Dharmendra Narain Choudhary, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington, DC, for consolidated plaintiffs and defendant-intervenors Vietnam Association of Seafood Exporters and Producers and consolidated plaintiff Anvifish Joint Stock Company.

Jonathan Michael Freed and Robert George Gosselink, Trade Pacific, PLLC, of Washington, DC, for consolidated plaintiff Vinh Quang Fisheries Corporation.

Nazakhtar Nikakhtar, Jonathan Mario Zielinski, and Nathaniel James Halvorson, Cassidy Levy Kent (USA) LLP, of Washington, DC, for consolidated plaintiffs, defendant-intervenors, and consolidated defendant-intervenors Catfish Farmers of America et al.

John Joseph Kenkel, deKieffer & Horgan PLLC, of Washington, DC, for consolidated plaintiff, plaintiff-intervenor, defendant-intervenor and consolidated plaintiff-intervenor Binh An Seafood Joint Stock Company.

Ryan Michael Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.  Of Counsel on the brief was Nanda Srikantaiah, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Department" or "Commerce") Final Results of Redetermination filed pursuant to the court's decision in Vinh Hoan Corp. v. United States, 39 CIT __, 49 F. Supp. 3d 1285 (2015) ("Vinh Hoan").  See Final Results of Redetermination Pursuant to *Vinh Hoan Corporation et al. v. United States*, Consol. Court No. 13-00156, Slip Op. 15-16 (February 19, 2015), Aug. 3, 2015, ECF No. 132 ("Remand Results").  In Vinh Hoan, the court remanded Commerce's final determination in the eighth administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam") for Commerce to reconsider and provide further explanation regarding its: (1) surrogate country selection; (2) determination to decline to adjust Vinh

Hoan's margin calculation to exclude glazing weight;[1] and (3) treatment of all of Plaintiff

Vinh Hoan Corporation's ("Vinh Hoan") sales to one customer as consignment sales

where record evidence indicated they were not consignment sales.  See Vinh Hoan, 39

CIT at __–__, 49 F. Supp. 3d 1291–1326; see also Certain Frozen Fish Fillets From the

Socialist Republic of Vietnam, 78 Fed. Reg. 17,350 (Dep't Commerce Mar. 21, 2013)

(final results of antidumping duty administrative review and new shipper reviews; 2010–

2011) ("Final Results"), as amended, 78 Fed. Reg. 29,323 (Dep't Commerce May 20,

2013) ("Amended Final Results"); Issues and Decision Memorandum for the Final Results

of the Eighth Administrative Review and Aligned New Shipper Reviews for Certain Frozen

Fish Fillets from the Socialist Republic of Vietnam, A-552-801, (Mar. 13, 2013), available

at http://ia.ita.doc.gov/frn/summary/vietnam/2013-06550-1.pdf (last visited May 20, 2016)

("Final Decision Memo").   The court also granted Defendant's request for a voluntary

remand for Commerce to reconsider its calculation for offsetting respondent's fish oil

byproduct.   See Vinh Hoan, 39 CIT at __–__, 49 F. Supp. 3d at 1321–22.   The court

reserved judgment on the surrogate value ("SV") issues relating to respondents' factors

of production ("FOP"), see id. at __, 49 F. Supp. 3d at 1291, and those issues are now

before the court for review as well.

---

[1] Glazing of frozen fish "refers to coating the finished fish fillet with water and then freezing it."
Mem. Supp. Pls. Catfish Farmers of America, et al.'s Rule 56.2 Mot. J. Upon Agency R. 6–7, Nov.
14, 2013, ECF No. 44 (citing e.g., Certain Frozen Fish Fillets From the Socialist Republic of
Vietnam, 68 Fed. Reg. 10,440, 10,441 (Dep't Commerce Mar. 5, 2003) (notice of amended
preliminary antidumping duty determination of sales at less than fair value)).

## BACKGROUND

On September 26, 2011, Commerce initiated this eighth antidumping duty ("AD") administrative review covering subject imports entered during the period of review ("POR"), August 1, 2010 through July 31, 2011.   See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 76 Fed. Reg. 61,076 (Dep't Commerce Oct. 3, 2011).   On August 30, 2012, Commerce issued its preliminary determination.  See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 77 Fed. Reg. 56,180 (Dep't Commerce Sept. 12, 2012) (preliminary results of the eighth antidumping duty administrative review and ninth new shipper reviews, partial rescission of review, and intent to revoke order in part) ("Prelim. Results"). Because Commerce treats Vietnam as a nonmarket economy ("NME"), id. at 56,181, it selected a surrogate market economy country to value the FOPs used in producing the subject merchandise to determine normal value.  Id. at 56,183.  Commerce preliminarily chose Bangladesh as the primary surrogate country.  Id. at 56,184.  In its final results, Commerce changed its primary surrogate country selection to Indonesia.  See Final Results, 78 Fed. Reg. at 17,351; see also Final Decision Memo at 27.

Vinh Hoan commenced this action, which was subsequently consolidated with actions filed by Anvifish Joint Stock Company ("Anvifish") and Vinh Quang Fisheries Corporation ("Vinh Quang"); Vietnam Association of Seafood Exporters and Producers ("VASEP"); Binh An Seafood Joint Stock Company ("Binh An"); and Catfish Farmers of America, an association of processors and growers, and individual U.S. catfish processors, America's Catch, Alabama Catfish Inc. dba Harvest Select Catfish, Inc.,

Heartland Catfish Company, Magnolia Processing, Inc. dba Pride of Pond, and Simmons Farm Raised Catfish, Inc. (collectively "CFA"), challenging various aspects of Commerce's final determination.  See Order on Consolidation and Briefing Schedule, July 23, 2013, ECF No. 31.  Each party filed a Rule 56.2 motion for judgment on the agency record challenging Commerce's <u>Final Results</u>.  <u>See</u> Vinh Hoan Corporation's Rule 56.2 Mot. J. Upon Agency R., Nov. 14, 2013, ECF No. 45; Pl.'s Rule 56.2 Mot. J. Upon Agency R., Nov. 14, 2013, ECF No. 41; Pl.'s Rule 56.2 Mot. J. Upon Agency R., Nov. 14, 2013, ECF No. 38; Mot. J. Agency R. Under USCIT Rule 56.2, Nov. 14, 2013, ECF No. 40 ("Binh An Mot."); Pls.' Rule 56.2 Mot. J. Upon Agency R., Nov. 14, 2013, ECF No. 43.

In <u>Vinh Hoan</u>, the court held that Commerce's primary surrogate country selection of Indonesia was contrary to law and not supported by substantial evidence.  <u>Vinh Hoan</u>, 39 CIT at __–__, 49 F. Supp. 3d at 1296–1321.  The court remanded Commerce's primary surrogate country selection and directed Commerce to: (1) consider 2011 gross national income ("GNI") record evidence in its primary surrogate country selection, <u>id.</u> at __–__, 49 F. Supp. 3d at 1296–1302; (2) consider the relative differences in GNI between Vietnam and potential surrogate country candidates as well as differences in data quality, <u>id.</u> at __–__, 49 F. Supp. 3d at 1302–06; (3) to the extent Commerce continues to rely upon non-fish FOPs to make its primary surrogate country selection, evaluate the alternative data sources based upon all of its selection criteria, <u>id.</u> at __, __–__, 49 F. Supp. 3d at 1306, 1309–11; and (4) weigh economic comparability against the strengths and weaknesses of the factors data in making its surrogate country selection.  <u>Id.</u> at __, 49 F. Supp. 3d at 1303.

The court also held that Commerce's application of facts available for certain costs pertaining to consignment sales to a specific customer, id. at __–__, 49 F. Supp. 3d at 1322–23, and Commerce's use of a FOP ratio in which the denominator included glazing weight were not supported by substantial evidence.  Id. at __–__, 49 F. Supp. 3d at 1323–26.  Finally, the court granted Defendant's request for a voluntary remand for Commerce to reconsider its calculation for respondents' fish oil byproduct offset.  Id. at __–__, 49 F. Supp. 3d at 1321–22.  The court reserved judgment on the parties' other challenges to Commerce's selection of SV data sources to value respondents' FOPs.  See id. at __, 49 F. Supp. 3d at 1291.

Commerce issued its draft remand redetermination on May 14, 2015.  See Draft Results of Redetermination Pursuant to *Vinh Hoan Corporation et al. v. United States*, Consol. Court No. 13-00156, Slip Op. 15-16 (February 19, 2015), PD 5, bar code 3276279-01 (May 14, 2015) ("Draft Remand Redetermination").  The parties submitted comments on various issues within Commerce's Draft Remand Redetermination.  See Binh An Comments on Draft Remand Redetermination, PD 9, bar code 3277761-01 (May 21, 2015); Vinh Hoan Comments on Draft Results of Remand Determination Pursuant to *Vinh Hoan Corporation et al. v. United States*, Consol. Court No. 13-00156, Slip Op. 15-16 (February 19, 2015), PD 12, bar code 3280579-01 (June 1, 2015) ("Vinh Hoan Comments on Draft Remand"); Petitioners' Comments on Draft Remand Redetermination, PD 13, bar code 3280875-01 (June 2, 2015).

The parties filed comments with the court regarding Commerce's remand results on October 23, 2015.  See Pl. VASEP's Comments Resp. to Department of Commerce's

Final Results of Redetermination, Oct. 23, 2015, ECF No. 148 ("VASEP Comments");

Pl.'s Comments Final Results Redetermination Pursuant to Remand, Oct. 23, 2015, ECF

No. 149 ("Vinh Hoan Comments"); Comments Final Results of Redetermination Pursuant

to *Vinh Hoan Corporation et al v. United States*, Consol. Court No. 13-00156, Slip Op.

15-16 (February 19, 2015), Oct. 23, 2015, ECF No. 150 ("Binh An Comments"); Pls.'

Comments Def.'s Remand Results, Oct. 26, 2015, ECF No. 151 ("CFA Comments").

Defendant and Defendant-Intervenors filed replies to the comments on Commerce's

Remand Results on February 24, 2016.  See Def.'s Resp. Pls.' Remand Comments, Feb.

24, 2016, ECF No. 171 ("Def.'s Resp. Remand Comments"); Def.-Intervenors' Reply to

Comments Def.'s Remand Results, Feb. 24, 2016, ECF No. 172.

The court sustains Commerce's selection of Indonesia as its primary surrogate

country, its determination to adjust Vinh Hoan's margin calculations to reflect net weight

sales, and its treatment of Vinh Hoan's consignment sales.  However, the court remands

to Commerce its determination to cap the SV of fish oil and to take the absolute value of

the [[                              ]] within its byproduct offset calculations for reconsideration and

explanation consistent with this opinion.

On the issues in Commerce's final determination for which the court reserved

judgment in Vinh Hoan, the court sustains Commerce's SV data selections for the

following inputs: (1) labor; (2) financial ratios; (3) inland freight and brokerage and

handling; (4) frozen broken meat; (5) fresh broken meat; and (6) fish waste, fish belly,

and fish skin.  The court also sustains Commerce's determination not to exclude the

"freight-in" expense within the selling, general, and administrative expense reported in the

financial statements selected to value respondents' financial ratios.  However, the court remands Commerce's SV data selections for rice husk and sawdust for further consideration and explanation.

## JURISDICTION AND STANDARD OF REVIEW

The court continues to have jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[2] and 28 U.S.C. § 1581(c) (2012),[3] which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306).

## DISCUSSION

In its remand determination, Commerce reconsidered its primary surrogate country selection, its treatment of consignment expenses for certain sales, its calculation of Vinh Hoan's offset calculations for fish oil and other byproducts, and its calculation of Vinh

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[3] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

Hoan's margin to adjust for glazing weight in its FOP usage ratio (collectively "Remand

Issues").  In <u>Vinh Hoan</u>, the court deferred all remaining issues ("Reserved Issues"), which

could have been affected by Commerce's reconsideration of its primary surrogate country

selection.

I.     **Remand Issues**

    A.     **Surrogate Country Selection**

        **1.  Record GNI Data and Relative Economic Comparability**

In <u>Vinh Hoan</u>, the court held that Commerce must consider 2011 GNI data that it

had accepted as record evidence in its economic comparability analysis.  <u>Vinh Hoan</u>, 39

CIT at __, 968 F. Supp. 3d at 1299.  The court directed Commerce to compare the relative

economic comparability of the countries on the list of potential surrogate countries

generated by Commerce's Office of Policy ("OP List") because "a comparison of the

[Bangladeshi Department of Agriculture Marketing, Ministry of Agriculture online

pangasius price data ("DAM Data")] and [Indonesian Aquaculture Statistics ("IAS Data")]"

does not make the choice of Indonesia "so clear cut that weighing the relative GNIs of the

countries would not improve Commerce's selection of the best available information."  <u>Id.</u>

at __–__, 49 F. Supp. 3d at 1304–05.

VASEP and Binh An argue that, once 2011 GNI data on the record is considered,

Indonesia is not economically comparable to Vietnam.  VASEP Comments 7; Binh An

Comments 1.   Defendant responds that Commerce found Indonesia economically

comparable to Vietnam after considering all GNI data on the record as well as relative

differences between the GNI data of potential surrogate countries.  Def.'s Resp. Remand

Comments 5–6.  The court finds that Commerce reasonably concluded that Vietnam and Indonesia are at comparable levels of economic development based upon 2010 and 2011 GNI data.[4]

In NME AD proceedings, Commerce values FOPs "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1). To the extent possible, Commerce shall use "the prices or costs of factors of production in one or more market economy countries that are-- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).

Commerce's regulatory preference is to "value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2) (2012).[5]  To implement this preference: (1) the Office of Policy ("OP") assembles "a list of potential surrogate countries that are at a comparable level of economic development to the NME country," whose per capita GNIs fall within a range of comparability to the per capita GNI of the NME;[6] (2) Commerce identifies

---

[4] Although Commerce complied with the court's order in its remand results, Commerce continues to protest the need to compare the relative economic comparability of the potential surrogate countries that satisfy its other surrogate country selection criteria. See Remand Results 3–4.  The Court of Appeals for the Federal Circuit has held that, even though Commerce may technically be the prevailing party, where the Court of International Trade sustains its decisions after remand, Commerce may adopt its position "under protest" in order to preserve its right to appeal.  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

[5] Further citations to the Code of Federal Regulations are to the 2012 edition.

[6] Although Commerce's regulations provide that it uses per capita GDP as the measure of economic comparability, Commerce began relying on per capita GNI as opposed to per capita GDP in 2007.  Antidumping Methodologies in Proceedings Involving Non-Market Economy

(footnote continued)

countries from the list "with producers of comparable merchandise"; (3) Commerce "determines whether any of the countries which produce comparable merchandise are 'significant' producers of that comparable merchandise"; and (4) if more than one country satisfies steps (1)–(3), Commerce will select "the country with the best factors data." See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited May 20, 2016) ("Policy Bulletin 04.1"). Under Commerce's practice, "[t]he surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability." Id. at 2. If more than one country is economically comparable to the NME country and a significant producer of comparable merchandise, Commerce selects the country with the best factors data based upon the data's: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; and (4) public availability. Id.

   In its remand results, Commerce reviewed the per capita GNIs of the countries on the OP List, noting "the *per capita* GNI of Bangladesh ($640) is approximately half that of Vietnam ($1,100), and the *per capita* GNI of Indonesia ($2,580) is approximately twice that of Vietnam." Remand Results 8. Commerce also reviewed the 2011 World Bank GNI data, and Commerce recognized that "the differences in *per capita* GNI for both

---

Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,246 n.2 (Dep't Commerce Mar. 21, 2007) (request for comment); see also 19 C.F.R. § 351.408(b). No party has challenged the use of GNI to determine economic comparability as contrary to Commerce's regulation. Commerce's use of GNI to determine economic comparability has been considered reasonable. See, e.g., Clearon Corp. v. United States, 38 CIT __, Slip Op. 14-88, at *9–10 (July 24, 2014) (finding Commerce's reliance on GNI reasonable and in accordance with law).

Bangladesh ($770) and Indonesia ($2,940) grew apart from Vietnam ($1,260) from 2010."
Id.  Commerce determined that, while Vietnam's GNI was twice that of Bangladesh and
half that of Indonesia, the differences in GNI in either relative or absolute terms are not
significant enough to render the countries at different levels of economic development.
Id.  In the broader context of world economic development Commerce found that the GNI
disparities were not significant.   Id.   Commerce's determination that Indonesia was
economically comparable to Vietnam is reasonable in light of GNI data on the record.

VASEP, Binh An, and Vinh Hoan argue that Commerce's economic comparability
analysis, which likened differences in economic comparability to a staircase in its remand
results, renders the economic comparability prong of the statute irrelevant to Commerce's
surrogate country selection process.[7]  VASEP Comments 8–9; Vinh Hoan Comments 1–
2; Binh An Comments 1.  VASEP argues Commerce concedes that Indonesia is not at
the same level of economic development as Vietnam by acknowledging Vietnam is on a
different step in Commerce's staircase analogy when 2011 GNI data is considered.
VASEP Comments 8.

---

[7] Within its protest to the court's holding requiring Commerce to compare the relative economic
comparability of Vietnam and the other OP List countries, Commerce likens ranges of per capita
GNI to a flight of stairs.  See Remand Results 4.  Commerce argues that "[e]ach (flat) step (each
level of economic development) is associated with a range of *per capita* GNI; and the staircase
itself (all of the steps collectively) is associated with a relatively broad range of GNI."   Id.
Therefore, Commerce argues that countries within the same step may have different GNI, but
their level of economic development does not change unless the jump in per capita GNI is large
enough to take them to a different step on the staircase of economic development.  See id.
Commerce argues that all countries on its non-exhaustive OP List are at a level of economic
development that is not only comparable, but the same as the NME country's level.  See id. at 6.
Therefore, Commerce argues "parsing differences in the *per capita* GNIs of the surrogate
candidates on a surrogate country list would do nothing to further statutory objectives or fulfill
statutory requirements."  Id.

These arguments are unpersuasive.  Commerce chose a country from its OP List here.  See Surrogate Country List, PD 22, bar code 3042499-01 (Nov. 22, 2011). Commerce considered the relative differences in GNI of the countries on the OP List in light of 2010 and 2011 data, as the court directed.  VASEP's argument implicitly relies upon the premise that the OP List, or a step in Commerce's analogy, sets the outer limits of economic comparability.  VASEP cites no authority to support such a reading, and this reading ignores the discretion given to Commerce by the statute and Commerce's methodology for generating the OP List.[8]  On remand, Commerce considered the changes in GNI between 2010 and 2011, and compared the relative economic comparability of the countries on the OP List in light of those changes.  Remand Results 9.  VASEP suggests no reason why it is unreasonable for Commerce to consider Indonesia at a comparable level of economic development as Vietnam based upon their 2010 and 2011 GNIs.

VASEP and Binh An also argue that the GNI range of the OP List, as originally composed based upon 2010 GNI data, limits Commerce's selection of a primary surrogate country.  VASEP Comments 8; Binh An Comments 1.  Yet, VASEP cites to no

---

[8] Commerce explained that, following the annual release of the World Bank Development Report containing the latest per capita GNI data, its OP examines GNI changes in both the NME country and countries on the list in the prior review.  See Remand Results 51.  From there, Commerce determines whether the GNI range of countries on the OP List needs to be changed in light of changes in GNI.  Id.  If it does, Commerce considers other countries to replace those whose GNI has changed relative to Vietnam's with other countries it considers at the same level of economic development as Vietnam.  Id.  The countries actually placed on the list are chosen to achieve "a degree of 'balance' in the GNI range" and a desire to "preserve the same number of surrogate countries above and below Vietnam (often three countries with per capita GNIs higher/lower than Vietnam, for a total of six)."  Id.

authority for this proposition. None of the cases VASEP cites support the notion that Commerce's OP List sets the limits of economic comparability.[9]

### 2. Evaluation of Whole Fish

In <u>Vinh Hoan</u>, the court ordered Commerce to further explain why certain facts that detracted from its specificity finding do not undermine its conclusion that the superiority of IAS Data supported selecting Indonesia as the primary surrogate country. <u>Vinh Hoan</u>, 39 CIT at __–__, 49 F. Supp.3d at 1314–15. In its Remand Results, Commerce has addressed the court's concerns, and it has provided a reasonable explanation for why it concluded IAS Data was a superior data source for evaluating respondents' whole live fish.

---

[9] VASEP cites several cases it argues support the notion that Commerce may not select a country outside the range of GNIs on its surrogate country list. These cases do not support VASEP's position. <u>See</u> VASEP Comments 9–11 (citing <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363 (Fed. Cir. 2010) (Commerce must select data to value FOPs from economically comparable countries except where such data is not available or irretrievably tainted by some statistical flaw); <u>Dupont Teijin Films v. United States</u>, 37 CIT __, 896 F. Supp. 2d 1302 (2013) (holding Commerce had not supported its conclusion that India was economically comparable to the NME in question because it failed to explain its refusal to consider 2009 GNI data and a surrogate country list from another review placed on the record by a party); <u>Dupont Teijin Films v. United States</u>, 38 CIT __, 997 F. Supp. 2d 1338 (2014) (upholding Commerce's revised surrogate country selection of South Africa, which was among the countries on the OP List from the same review, after consideration all data placed on the record); <u>Jiaxing Bro. Fastener Co. v. United States</u>, 38 CIT __, 961 F. Supp. 2d 1323 (2014) (holding it reasonable for Commerce to decline to select potential surrogate country not included on the OP List); <u>Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States</u>, 37 CIT __, 896 F. Supp. 2d 1313 (2013) (holding that the India exclusion from the surrogate country list was not unreasonable in light of the fact that it had a lower GNI than the countries on Commerce's surrogate country list)).

VASEP claims that Commerce mistakenly relied upon <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 38 CIT __, 986 F. Supp. 2d 1362 (2014), to expand the range of economically comparable surrogate country candidates because, in that case, the weighing of economic comparability against data considerations was limited to countries on the OP List. <u>See</u> VASEP Comments 13. As already discussed, this argument relies on the incorrect premise that the OP List sets the limits for economic comparability. Therefore, there is no merit to VASEP's argument that the weighing mandated by <u>Ad Hoc Shrimp</u> is misapplied here.

Commerce found that the data is specific because it covers pangasius hypophthalmus, the species of pangasius fish grown by respondents. See Remand Results 10–13. Commerce resolved that the presence of pangasius jambal, a different species, in IAS Data did not distort the data because Commerce excluded prices for pangasius jambal by excluding data from paddy and floating net cultures, which it concluded were common cultivation methods for pangasius jambal. Id. at 11–12. Commerce also determined the flesh quality differences among species do not affect price because prices for pangasius jambal are similar to those of pangasius hypophthalmus. See id. at 13. As a result, Commerce found that even if small amounts of pangasius jambal were in IAS Data, the price of pangasius hypophthalmus would not be distorted. Id. at 12–13 (citing CFA Surrogate Value Data at Ex. 4, PD 330, bar code 3106818–18 (Nov. 20, 2012); VASEP Rebuttal Surrogate Value Data at Ex. 7A ¶4, PD 368, bar code 3108726-04 (Dec. 4, 2012)). Commerce also discounted the notion that the IAS Data contains data of dead fish processed in the industry because it found the IAS publication explicitly excludes fish discarded for any reason and, where fish are processed, the quantities and values recorded are converted to initial live weight. Id. at 15 (citing CFA Surrogate Value Data at Ex. 4, PD 330, bar code 3106818-18 (Nov. 20, 2012)). In contrast, Commerce found the Bangladeshi DAM Data is undervalued by its inclusion of dead fish. Id. at 16. Commerce overlooked apparent differences in farming practices between Indonesia and Vietnam because it found pond production of pangasius hypophthalmus represents the majority of pangasius production in both Vietnam and Indonesia. Id. at 16–17. Finally, Commerce minimized the impact of frozen pangasius

fillet imported into Indonesia because the record evidence submitted by VASEP shows no causal relationship between such imports and the price of whole live fish in Indonesia. Id. at 17.

Commerce found that the DAM data and the IAS Data are contemporaneous because both data sources cover the POR. Id. at 18–19. Commerce used both the 2011 and 2010 IAS publications to calculate the whole live fish surrogate value to ensure full POR coverage. Id. at 18. Commerce explained that the additional coverage arose because of its preference to have full coverage. Commerce also found the IAS Data had broader market average representation and a greater volume of pangasius production. Id. at 19. Commerce also resolved that IAS Data is more reliable because of concerns that DAM fails to adequately vet its data. See id.

Commerce has explained and supported its findings and assumptions regarding the superior specificity of IAS Data in comparison to Bangladeshi DAM Data in light of the detracting evidence the court directed it to consider on remand. Additionally, Commerce, as directed by the court, considered the contemporaneity of both data sources and determined that concerns with the DAM Data made the IAS Data the superior source. Therefore, Commerce reasonably determined that IAS Data is superior to Bangladeshi DAM Data for valuing whole live fish, supporting the selection of Indonesia as the primary surrogate country.

### 3. Evaluation of Financial Statements

In Vinh Hoan, the court held that Commerce relied on circular reasoning when it selected Indonesian PT Dharma Samudera Fishing Industries ("DSFI") financial

statements to value the respondent's financial ratios over those of Bangladeshi companies, Apex Foods Limited ("Apex") and Gemini Sea Food ("Gemini"). Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1311. Commerce's reasoning was circular because it chose the DSFI statements based upon its primary surrogate country selection while, at the same time, appearing to rely upon the selection of the DSFI statements to support its primary surrogate country selection. Id.

On remand, Commerce found the Indonesian financial statements from DSFI superior to the Bangladeshi alternatives because DSFI produces comparable merchandise, i.e., frozen fish fillets, whereas Apex and Gemini do not primarily produce frozen fish fillets. Remand Results 74. Therefore, because Commerce observed DSFI's production was a closer match to that of respondents, Commerce concluded the superiority of the Indonesian financial statements favored selecting Indonesia as the primary surrogate country. Id. at 74–75. Vinh Hoan does not challenge Commerce's conclusion that the closer match of DSFI's production experience to that of respondents favors selecting Indonesia as the primary surrogate country. See Vinh Hoan Comments on Draft Remand at 22–23; see also Remand Results 73. This conclusion is reasonable.

#### 4. Evaluation of Non-Fish FOPs

In Vinh Hoan, the court found that Commerce failed to evaluate all its selection criteria for non-fish FOPs, rendering its finding that Indonesian data is superior to Bangladeshi data to value non-fish FOPs unsupported by substantial evidence. See Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1309. In its remand results, Commerce evaluated

each non-fish FOP that it relied on in support of its surrogate country selection using all of its selection criteria.  See Remand Results 19–27, 57–78.

     For labor, Commerce selected the Indonesian International Labor Organization Chapter 5B data from 2008 ("ILO Chapter 5B Data") because Commerce found that the Indonesian data is more specific than the Bangladeshi alternative.  Id. at 21–22, 75.  With regard to frozen broken meat and fish oil, Commerce had only two surrogate value sources before it, which are both from Indonesia.  Id. at 28–29, 65, 79–80.  For fresh broken meat, foreign brokerage and handling, inland freight, rice husk, fish waste, fish belly, fish skin, and fish meal, Commerce concedes that it does not rely upon its selection of SV data to support its decision to select Indonesia as the primary surrogate country. Id. at 19, 60–61, 68–72, 78.  Commerce argues that its SV data selections for sawdust and fish oil support its selection of Indonesia, but, as discussed below, the court is remanding those selections for further consideration and explanation.

### 5.  Weighing of Economic Comparability Against Data Considerations

     In Vinh Hoan, the court held that, in order to select Indonesia as its primary surrogate country, Commerce must weigh data considerations against differences in economic comparability that may have favored selecting Bangladesh.  See Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1306.  On remand, Commerce reasonably determined that significant concerns with Bangladeshi data sources outweigh the modest relative and absolute differences in per capita GNI between Vietnam and Indonesia.

     Commerce found that "although Bangladesh's GNI is closer in absolute terms to Vietnam's than is Indonesia's GNI, . . . data considerations outweigh the relatively modest

differences in *per capita* GNI."    Remand Results 9.    No party challenges the

reasonableness of Commerce's weighing of data considerations concerning both fish and

non-fish FOPs as they relate to surrogate country selection.   Rather, VASEP challenges

the very premise that Commerce may engage in such a weighing in light of the fact that

Indonesia's 2011 GNI pushed it outside the range of GNIs on the OP List.   See VASEP

Comments 11.

       VASEP and Binh An argue that Commerce ignored its practice for selecting a

primary surrogate country by failing to work through the criteria sequentially to exclude

Indonesia on economic comparability grounds before considering data concerns.   See

VASEP Comments 11; Binh An Comments 1.   However, as already discussed, despite

the presence of 2011 GNI data on the record, Commerce reasonably found Indonesia

economically comparable to Vietnam and a significant producer of comparable

merchandise.   Commerce's practice permits it to select the country with the best factors

data in such circumstances.[10]   See Policy Bulletin 04.1 at 4. Commerce weighed the

relative economic comparability of Indonesia in light of its quality of data as compared to

the other potential surrogate countries and reasonably selected Indonesia as the primary

surrogate country.

---

[10] VASEP points to Commerce's removal of Indonesia from its 2011 OP List and argues that
Commerce's stated explanation of how it updates the surrogate country list represents a finding
that Indonesia does not possess sufficient data quality to remain on the OP List.   See VASEP
Comments 12.   The 2011 OP List was not on the record of this administrative review.  Only the
2011 GNI data was on the record.   Therefore, arguments regarding the 2011 OP List are improper
for the court to consider.

### B.    Consignment Sales/Use of Facts Available

In <u>Vinh Hoan</u>, the court remanded Commerce's determination to treat all sales to one of Vinh Hoan's customers as consignment sales.  <u>Vinh Hoan</u>, 39 CIT at __, 49 F. Supp. 3d at 1323.  In its remand results, Commerce reconsidered its decision, and found that "only some of the sales by Vinh Hoan's customer were consignment sales."  Remand Results 42.  Commerce further found that the sale arrangement continued from 2009 until February 2011, "at which point the two parties agreed that Vinh Hoan would make a one-time sale to its customer to purchase the remaining inventory."  <u>Id.</u>  On remand, Commerce decided to treat only sales from Vinh Hoan's customer that entered cold storage pursuant to a consignment arrangement as consignment sales.  <u>Id.</u>  Accordingly, on remand Commerce applied the "credit expenses and inventory carrying costs solely to Vinh Hoan's consignment sales to the customer with which it had a consignment agreement."  <u>Id.</u>  No party commented on or challenged Commerce's decision on remand. Commerce has complied with the court's order and its decision is reasonable.

### C.    Adjustment to Normal Value to Reflect Glazing

In <u>Vinh Hoan</u>, the court held that Commerce's determination not to exclude glazing weight from the FOP usage ratio was not supported by substantial evidence.[11]  <u>See</u> <u>Vinh Hoan</u>, 39 CIT at __ – __, 49 F. Supp. 3d at 1323–24.

---

[11] In the final determination, Commerce used a gross weight denominator because it found that normal value and U.S. price were both reported on a gross weight basis.  <u>See</u> Final Decision Memo at 48.  Commerce found that no adjustment to the denominator was necessary or warranted because the relevant basis of comparison is consistent between normal value and U.S. price.  <u>Id.</u>

In its remand results, Commerce reconsidered Vinh Hoan's gross weight denominator, i.e., inclusive of glazing, for FOP usage ratios and found that it "should re-calculate Vinh Hoan's margin using the net weight denominator."  Remand Results 42. Commerce adjusted Vinh Hoan's FOP database from a gross weight basis to a net weight basis.  Id.  To do so, Commerce re-opened the record and "requested that Vinh Hoan submit a revised FOP database using the net quantity denominator that is on the record." Id. at 44.  Commerce used this revised database to calculate Vinh Hoan's margin on a net weight basis on both the normal value and export price sides of its margin calculations. Id.  Commerce considered the discrepancy between the reporting bases, and followed its practice to ensure an accurate comparison.  See id. at 43–44.  Therefore, Commerce's determination is supported by substantial evidence.

Vinh Hoan objects to Commerce's approach on remand because it claims that the decision is unsupported by the record.  Vinh Hoan Comments 17.  Vinh Hoan argues that Commerce's finding that Vinh Hoan reported its U.S. sales on a net weight basis is incorrect and that it did not sell any glazed products during the POR.  Id.  Defendant responds that Vinh Hoan failed to raise any arguments about whether it reported sales on a net weight basis in its comments to the Draft Remand Redetermination.  Def.'s Resp. Remand Comments 23.  Therefore, Defendant argues Vinh Hoan has failed to exhaust its administrative remedies.

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Exhaustion of administrative remedies is a doctrine that holds "that no one is entitled to judicial relief for a supposed or threatened

injury until the prescribed administrative remedy has been exhausted." Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003).  The court generally "takes a 'strict view' of the requirement that parties exhaust their administrative remedies before [Commerce] in trade cases." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Here, despite the clear opportunity to do so in its comments to Commerce's Draft Remand, Vinh Hoan failed to object to Commerce's determination.  See Vinh Hoan Comments on Draft Remand.   Therefore, the court does not address Vinh Hoan's arguments because it has failed to exhaust its administrative remedies and Commerce's remand redetermination on this issue is sustained.

### D.    Fish Oil Byproduct Value

Defendant requested a voluntary remand to reconsider its calculation of Vinh Hoan's fish oil byproduct offset.  See Def.'s Resp. Pls.' Mots. J. Upon Agency R. 79–80, May 22, 2014, ECF No. 77 ("Def.'s Resp. Br.").  In Vinh Hoan, the court granted Defendant's request.  See Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1322.  Since the court granted Defendant's remand request for Commerce to revisit its calculations, the court did not review Commerce's determination to use a constructed value in lieu of import data to value Vinh Hoan's fish oil byproduct.  The court addresses that issue now.

In its remand results, Commerce found

that the Indonesian GTA import data under HTS 1504.20.9000, "Fish Fats & Oils & Their Fractions Exc Liver, Refined Or Not, not chemically Mod" is the best available information to value this by-product, and that a constructed value ("CV") for fish oil is appropriate based upon record evidence related to the nature of Vinh Hoan's fish oil by-product.

Remand Results 44.  Vinh Hoan challenges Commerce's determination to "cap" the value of fish oil by constructing a value.  See Vinh Hoan Comments 7–10.  Defendant responds that Commerce's determination to apply a constructed value as a cap to value Vinh Hoan's fish oil byproduct was reasonable because: (1) the value of its fish oil import exceeded the value of the main input if the raw import data were used; and (2) the HTS category, by its terms, includes refined fish oil, and record evidence indicates the fish oil produced by Vinh Hoan is unrefined.  Def.'s Resp. Remand Comments 25.  While Commerce purports to be using Indonesian import data as a surrogate value for fish oil, it appears that what Commerce calls a "cap" is a rejection of the import data in favor of a constructed value.  If it is, Commerce has not explained the reasonableness of that decision.  The court remands this issue to Commerce for further consideration and explanation.

In NME cases, Commerce obtains a normal value by valuing FOPs used to produce the subject merchandise and adding "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1). Commerce values the FOPs "based on the best available information regarding the values of such factors in a market economy country or countries."  Id.  Commerce uses the same methodology to "offset production costs incurred by a respondent with the sale of by-products generated during the production process."  See Final Decision Memo at 34 (citing 19 U.S.C. § 1677b(c); Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006)); see also Tianjin Magnesium Int'l Co., v. United States, 34 CIT 980, 993, 722 F. Supp. 2d 1322, 1336 (2010) (explaining

that "[t]he antidumping statute does not prescribe a method for calculating byproduct offsets instead leaving the decision to the technical expertise of the Department.").

Commerce has broad discretion in deciding what constitutes the best available information because the term is not defined in the statute.  See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  However, Commerce must ground its selection of the best available information in the overall purpose of the AD statute, calculating accurate dumping margins.  See CS Wind Vietnam Co., 38 CIT at __, 971 F. Supp. 2d at 1277 (citing Rhone Poulenc, Inc., 899 F.2d at 1191); see also Parkdale Int'l, 475 F.3d at 1380.

On remand, Commerce "continues to find that Indonesian GTA import data under HTS 1504.20.9000, 'Fish Fats & Oils & Their Fractions Exc Liver, Refined Or Not, not chemically Mod' is the best available information to value [Vinh Hoan's fish oil byproduct]." Remand Results 44.  However, Commerce continued to use a constructed value to cap the Indonesian import data.  Commerce explained the purpose of the cap is to remedy the fact that Indonesian import data includes refined fish oil in addition to the unrefined fish oil produced by Vinh Hoan.  Id. at 80.  Commerce found that Vinh Hoan's fish oil was "only unrefined oil that is minimally processed, stored in a vat, and sold unpackaged."  Id. (citing Verification of the Sales and Factors of Production Response of Vinh Hoan Corporation in the 2010–2011 Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam at 33, 39–40, PD 393, bar code 3110870-01 (Dec. 14, 2010)).  Commerce concluded it would be illogical to value an unrefined byproduct from unmanipulated Indonesian import data because doing so would result in a SV for Vinh

Hoan's unrefined fish oil ($3.10/kg) greater than the whole fish SV generated by Commerce ($1.79/kg).  Id. at 79–80.

However, Commerce has a prescribed methodology for valuing FOPs, including byproducts of selecting the best available data from possible sources using well established criteria such as specificity, representativeness and contemporaneity among others.  See Policy Bulletin 04.1 at 4.  Here, Commerce purports to be following this methodology, but it seems to have applied a constructed value that does not use the import category in any meaningful way.  Commerce acknowledged that it has constructed a value for fish oil.  Commerce called that constructed value calculation a "cap."  The notion of a cap implies that the product of the calculation will then be applied to existing import data for fish oil.  Commerce's description of its methodology appears to acknowledge this concept, see Remand Results 80, yet Commerce apparently did not apply the constructed value to existing import data on fish oil in any way.  It seems to have simply used the constructed value yielded by its calculation as the SV for fish oil.  Commerce failed to explain why its change in methodology is reasonable.

Although the court cannot say Commerce unreasonably determined that Vinh Hoan's fish oil is a low value-added product, see id. at 30, Commerce has not explained why it is reasonable to depart from its normal methodology of choosing the best SV data source to value respondents' fish oil byproduct.  Commerce may have good reason to go beyond its stated methodology and construct a value, but Commerce needs to state what it is doing and explain why it is reasonable so that the court may review Commerce's methodology and determination.  The court cannot review whether Commerce's choice

of Indonesian import data is reasonable when it is unclear how, to what extent, or even if

Commerce used Indonesian import data for fish oil in calculating a SV for Vinh Hoan's

fish oil.  The court remands Commerce's fish oil determination for further consideration

and explanation and does not reach Vinh Hoan's challenges with respect to Commerce's

calculations of the constructed value for fish oil.

### E.    Offset Calculations for Byproducts

In Vinh Hoan, the court granted Defendant's request for a voluntary remand for

Commerce to reconsider its calculations concerning Vinh Hoan's byproduct offsets.  See

Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1322; see also Def.'s Resp. Br. 79–80.  As a

result, the court did not review CFA's challenge to Commerce's determination with

respect to its byproduct offset calculation.  The court addresses that issue now.

On remand, Commerce continues to [[        ]] Vinh Hoan's normal value because

of a byproduct offset even though the costs of producing that byproduct [[

                                                                    ]].[12]  Instead of [[        ]] the

---

[12] Commerce calculated Vinh Hoan's byproduct offset through the following steps:

1.  Commerce started with Vinh Hoan's total byproduct sales revenue stated on a per unit basis ("Total Byproduct Revenues");

2.  Commerce then subtracted Vinh Hoan's costs for processing its byproducts stated on a per unit basis ("Total Byproduct Processing Costs") from its Total Byproduct Revenues to generate its byproduct offset ("Net Byproduct Offset");

3.  Commerce then [[        ]] the absolute value of the Net Byproduct Offset, which represents the [[                                        ]] its byproducts, from the Total Byproduct Processing Costs.

See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Remand Redetermination of Antidumping Duty Administrative Review; 2010–2011: Final Redetermination Analysis

(footnote continued)

costs to Vinh Hoan's normal value or ignoring the number altogether, Commerce

converted the [[          ]] number to a [[                    ]], i.e., took an absolute value,

and [[                                      ]] normal value.[13]  See Remand Results 82; see

also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Remand

Redetermination of Antidumping Duty Administrative Review; 2010–2011: Final

Redetermination Analysis Memorandum for Vinh Hoan Corporation at Attach. I, CD 4, bar

code 3295865-01 (Aug. 3, 2015).

    Commerce has failed to provide a reasonable explanation for using an absolute

value, which had the effect of [[                                      ]].  Defendant responds

that Commerce's calculation was reasonable and consistent with its practice to offset a

byproduct's commercial value by its production costs.  Def.'s Resp. Remand Comments

at 30 (citing Guangdong Chems. Imp. & Exp. Corp., 30 CIT at 1422, 460 F. Supp. 2d at

1373).  Commerce does not contest that Vinh Hoan's [[

---

Memorandum for Vinh Hoan Corporation at Attach. I, CD 4, bar code 3295865-01 (Aug. 3, 2015).
The result of Commerce's calculation of Vinh Hoan's Net Byproduct Offset was [[          ]].  See
id.  Therefore, the result of [[                    ]] the absolute value of the [[          ]] Net Byproduct
Offset was to [[          ]] the [[
                                        ]].  See id.  If Commerce had [[          ]] Vinh Hoan's Net
Byproduct Offset without applying an absolute value, the effect would have been to [[     ]] Vinh
Hoan's Net Byproduct Offset to its Total Byproduct Revenues.  See id.
[13] Commerce credited Vinh Hoan's statement that it "'constructed a dedicated scrap facility and
storage tanks with a substantial capital investment to process and recover fish oil.'"  Remand
Results 82 (quoting Vinh Hoan Comments on Draft Remand at 15–16).  Commerce therefore
found that

    Vinh Hoan does incur some costs during the by-product production cost.
    Therefore, we find that the absolute value should not be removed from the
    calculation in order to reflect such costs.

Id.

]], but its only response to CFA's challenge is that Vinh Hoan's actual costs must be reflected in its byproduct offset calculation.  See Remand Results 82.  The court does not find this reasoning persuasive.  On remand, Commerce must reconsider its byproduct offset calculation or provide a reasonable explanation why granting such an offset is reasonable in such circumstances.[14]

## II.     Reserved Issues

Prior to remand, plaintiffs filed Rule 56.2 motions challenging Commerce's selection of SV data to value respondents' labor, sawdust, rice husk, financial ratios, including "freight-in" for the selling, general and administrative ("SG&A") expense ratio, inland freight and brokerage and handling, and byproducts produced by Vinh Hoan, including frozen broken meat, fresh broken meat, and fish waste byproducts.  See Mem. Law Supp. Vinh Hoan Corporation's Mot. J. Upon Agency R. 19–50, Nov. 14, 2013, ECF No. 39; Errata Memo. Vinh Hoan Corporation's Mem. Supp. 56.2 Mot., Nov. 21, 2013, ECF No. 53 (collectively "Vinh Hoan Br."); Mem. Law Supp. Pl.'s Rule 56.2 Mot. J. Upon Agency R. 57–61, Nov. 14, 2013, ECF No. 37 ("VASEP Br."); Mem. P. & A. Supp. Anvifish Joint Stock Company and Vinh Quang Fisheries Corporation for J. Upon Agency R. 26–33, Nov. 14, 2013, ECF No. 42 ("Anvifish & Vinh Quang Br."); Binh An Mot.  In Vinh Hoan, the court noted that Commerce's consideration of its primary surrogate country selection could impact Commerce's analysis for all these issues.  Vinh Hoan, 39 CIT at __, 49 F.

---

[14] To the extent Commerce is arguing that its calculation is attempting to reflect Vinh Hoan's initial capital investment to process and recover fish oil, see Remand Results 82, Commerce provides no explanation of how subtracting the absolute value of its [[                                                    ]] bears any rational relationship to such costs.

Supp. 3d at 1321. Therefore, the court reserved judgment on these issues until after remand. See id. The court now addresses these issues.

### A. Labor

In its preliminary results, Commerce valued labor using 2011 labor wage rate data for fishery workers in Bangladesh published by the Bangladeshi Bureau of Statistics Data. Prelim. Results, 77 Fed. Reg. at 56,185. In its final determination, Commerce valued labor using ILO Chapter 5B Data from Indonesia. Final Decision Memo at 30–31. Vinh Hoan and VASEP challenge Commerce's selection of ILO Chapter 5B Data as the best available information to value respondents' labor. Commerce reasonably selected ILO Chapter 5B Data to value respondents' labor FOP.

Commerce found the Indonesian data is specific and from the primary surrogate country.[15] Id. at 30. Commerce found that ILO Chapter 5B Data is specific to Vinh Hoan's labor because "the explanatory notes for subclassification 15 of the ISIC-Revision 3 Standard . . . specifically state that the category includes the processing and preservation of fish and fish products." Id. While Vinh Hoan speculates that the inclusion of labor data from other food-related industries may not render the ILO Chapter 5B Data sufficiently specific, Vinh Hoan Br. 45, it cites no record evidence that such labor data has significantly different pricing from labor within the fish processing industry.

---

[15] In evaluating Indonesian ILO Chapter 5B Data, Commerce analyzed other data selection criteria, including public availability, representativeness of a broad market average, and tax and duty exclusivity. See Final Decision Memo at 30. However, Commerce referenced its practice, which is to use industry-specific labor rates from the primary surrogate country to value respondents' labor FOP. See id. at 31 (citing Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce June 21, 2011)).

Commerce did not follow its normal practice of using ILO Chapter 6A Data because no such data was on the record.   Final Decision Memo at 30.   While Commerce acknowledged that the ILO Chapter 5B Data is not contemporaneous, it found the ILO Chapter 5B Data otherwise satisfies the balance of its surrogate value criteria.  Id. at 30–31.   Commerce noted that no other source comported with its practice of selecting labor SV data because neither Philippine nor Bangladeshi sources are from the primary surrogate country.[16]   Therefore, Commerce's determination was reasonable.

### B.   Energy Inputs: Saw Dust and Rice Husk

#### 1.  Exhaustion of Administrative Remedies

Vinh Hoan argues that Commerce improperly valued respondents' sawdust FOP using Indonesian GTA import data under HTS 4401.30 which covers "Sawdust and Wood Waste and Scrap."   Vinh Hoan Br. 19–26.   Vinh Hoan also argues that Commerce improperly valued rice husk using Indonesian GTA import data under HTS 1213.00 which covers "Cereal Straw and Husks, Un prepared, Whether or Not Chopped, Ground, Pressed or in the Form of Pellets."   Vinh Hoan Br. 26–33.   Defendant argues that Vinh Hoan failed to exhaust its administrative remedies regarding the values of these inputs. Def.'s Resp. Br. 53–54.

---

[16] As stated in Vinh Hoan, it is inappropriate for Commerce to rely upon a surrogate country selection to choose a SV and at the same time rely upon the choice of a SV to support its surrogate country selection.  Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1311.  The court notes that in this instance, Commerce, in its remand determination, has explained why its SV choice for labor supports its primary surrogate country selection independent of its practice from choosing a surrogate value for labor from the primary surrogate country.  Commerce relies not on the fact that the data is from Indonesia, but that it is superior to the Bangladeshi data because it meets more of Commerce's criteria.  Remand Results 21–22, 75.

The court finds it is not appropriate to require Vinh Hoan to exhaust these arguments before the agency.  The overarching purpose of the exhaustion doctrine is to "allow[] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review–advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88–90 (2006)).  Nonetheless, the Court of Appeals for the Federal Circuit has consistently held that the application of exhaustion principles in trade cases is exercised with a measure of discretion by the Court.  See, e.g., Corus Staal, 502 F.3d at 1381; Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006); Consol. Bearings, 348 F.3d at 1003.  Requiring a party to exhaust administrative remedies may not be appropriate where doing so would require it to speculate as to one of many courses the agency might take.  Requiring such speculation would not promote administrative efficiency.

Here, in its preliminary results, Commerce valued sawdust and rice husk using import data from Bangladesh and the Philippines, respectively.  See 8th Administrative Review, and Aligned 9th New Shipper Reviews, of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results at 5, PD 469, bar code 3137856-01 (Aug. 30, 2012) ("Prelim. Surrogate Value Memo").  With regard to sawdust, Vinh Hoan raised concerns with the specificity and reliability of 2006 UN Comtrade data from Bangladesh under HTS 4401.30.  See Vinh Hoan General Issues Case Brief at 5–7, PD 400, bar code 3111845-01 (Dec. 21, 2012) ("Vinh Hoan General

Case Br."). In addition, Vinh Hoan cited several CBP rulings of value-added products classified under the tariff heading it placed on the record, which it contended demonstrated that the heading would not "accurately apply to the simple sawdust used by Respondents." Id. at 5–6. In light of the fact that Commerce changed its surrogate country selection and its selected data source between its preliminary and final determinations, the court does not require any more of Vinh Hoan at the administrative level to preserve its argument. Commerce was aware of Vinh Hoan's specificity-driven objections to this import data under HTS heading, which are the very same objections raised here. Commerce could have addressed these arguments in its final determination, but it did not. Likewise for rice husk, Vinh Hoan could not be expected to speculate whether Commerce might change course between its preliminary and final results. Vinh Hoan had no objection to Commerce's determination in the preliminary results and it had no notice that Commerce's chosen source was even under consideration before Commerce's final determination. Vinh Hoan made all the arguments it could be expected to make before Commerce in its case brief. Therefore, it is not appropriate to require Vinh Hoan to exhaust its arguments before the agency before making them here.

### 2. Sawdust

Commerce's selection of Indonesian import data under HTS 4401.30 to value respondents' sawdust FOP is not supported by substantial evidence. Commerce failed to respond to arguments and record evidence that significantly detracts from its determination that Indonesian import data is specific and reliable. Vinh Hoan placed several Customs Rulings on the record with respect to HTS 4401.30 that show that the

heading includes higher value added products.[17]  Vinh Hoan also demonstrates that the

values contained within the HTS that Commerce used in its SV calculations range from

$0.29 per kilogram to $27.23 per kilogram.[18]  See Vinh Hoan Br. 22, Attach. 3 (derived

from 8th Administrative Review, and Aligned 9th New Shipper Reviews, of Certain Frozen

Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Final Results

at Ex. 1, PD 436, bar code 3124119-01 (Mar. 13, 2013) ("Final Surrogate Value Memo")).

On remand, it must do so.[19]

     Both Commerce and Defendant rely heavily on Commerce's regulatory preference

to choose data from a primary surrogate country to support Commerce's selection of

Indonesian import data to value sawdust.  See Final Decision Memo at 32; Def.'s Resp.

Br. 54.  Commerce's regulation provides that it "normally will value all factors in a single

---

[17] Vinh Hoan's submission included Customs Rulings involving HTS subheading 4401.30, which covers a variety of products including cat litter, wood fire starters made from wood scraps, and barbecue bisquettes burned to create smoke for flavoring food.  See Re-Submission of Vinh Hoan November 20, 2012 Surrogate Value Submission at Ex. 3, PD 399, bar code 3111830-01 (Dec. 21, 2012).  While Commerce addresses these rulings in its remand results as part of its surrogate country analysis, it does not address the fact that these appear to be value added products.  See Remand Results 63.

[18] Neither the quantities of imported material nor the range of prices in the import category clearly indicate that Commerce could discount the possibility that the data contained significant volumes of non-specific higher value-added merchandise without any analysis.  See Vinh Hoan Br. Ex. 4; see also Final Surrogate Value Memo at Ex.1.  Nothing about the import statistics in this review makes Commerce's path to its specificity finding reasonably discernible in light of this detracting evidence.

[19] Vinh Hoan made similar specificity arguments with respect to HTS 4010.30 at the administrative level in connection with Bangladeshi import data.  See Vinh Hoan General Case Brief at 5–7.  Commerce chose Indonesia HTS 4010.30 and did not address the arguments concerning specificity or the potential aberrational values that could be represented by this HTS heading. Prelim. Surrogate Value Memo at 5.  If Commerce did not believe that these arguments carried over to the Indonesian HTS category because Commerce changed SV data sources after its preliminary determination, Defendant has made no such argument.  Rather, Defendant rests on its exhaustion argument.  See Def.'s Resp. Br. 57–58.  As already discussed, the court declines to require Vinh Hoan to speculate as to a change of course by Commerce in such circumstances.

surrogate country."  19 C.F.R. § 351.408(c)(2).  Despite this regulatory preference, the data from the primary surrogate country must also meet Commerce's stated data selection criteria.  Commerce's explanation that the HTS heading includes "Sawdust" fails to address record evidence that the import data covered other materials and possibly higher value-added materials.  Elsewhere in this review, Commerce rejected finding import data specific where it includes data for merchandise other than the input used by respondents.  See, e.g., Final Decision Memo at 40 (concluding the proposed HTS data set for fresh broken fish fillet included "whole unbroken fish fillets").  In light of the record data indicating that non-specific merchandise may have rendered the HTS category non-specific, Commerce cannot simply rely upon the fact that the word "sawdust" is in the heading to conclude the data source is specific and not aberrational.

### 3.  Rice Husk

Vinh Hoan argues that Commerce's selection of Indonesian import data under HTS 1213.00 to value rice husk is not specific because the import category is overly broad and contains aberrational values.  Vinh Hoan Br. 27–28.  Defendant responds only with its exhaustion arguments.[20]  Def.'s Resp. Br. 57.  The court finds Commerce's selection of

---

[20] In Vinh Hoan, the court reserved decision on its review of Commerce's SV data selection for rice husk and other FOPs because a change to Commerce's primary surrogate country selection could have potentially affected Commerce's selections.  Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1291.  For this reason, the court reviews the reasonableness of Commerce's determinations in its final determination.  In its remand determination, Commerce correctly restricts its consideration of the parties' comments to whether the SV data for rice husk and other non-fish FOPs supported its selection of Indonesia as the primary surrogate country.  In that regard, Commerce found that Indonesian and Philippine data sources for rice husk were otherwise equal and therefore had "no need to depart from [its] choice of surrogate country to value rice husk."  Remand Results 61.  The court therefore also restricts its review of Commerce's SV data selections to the findings in its final determination.

Indonesian import data to value rice husk is not supported by substantial evidence because Commerce failed to address evidence that detracted from its finding that Indonesian import data is specific and non-aberrational.

Vinh Hoan points to record evidence suggesting that the prices in the Indonesian import category are aberrational.  For example, Vinh Hoan notes that Commerce's SV selection resulted in a value of $10.03 per kilogram for rice husk.  Vinh Hoan Br. 28–29. Vinh Hoan also notes that the record contained price quotes from two Bangladeshi companies that are specific, showing values ranging from $0.18–$0.19 per kilogram and $0.10–$0.12 per kilogram, respectively.  See id. at 30 (citing VASEP Resubmission of Surrogate Value Submission of Nov. 20, 2012 at Exs. 2B–2C, PD 404–405, bar codes 3112136-01–02 (Dec. 26, 2012)).  Vinh Hoan also notes that rice husk, like sawdust, is used by respondents as a fuel source in the production of its fish oil and fish meal byproducts.  Id. at 26 (citing Vinh Hoan Corporation – Section D Questionnaire Response at 37, PD 62, bar code 3049396-01 (Jan. 3, 2012) ("Vinh Hoan Section D Response")). Vinh Hoan argues that the SV assigned by Commerce, which represented approximately 11 percent of the normal value of the subject merchandise, does not reflect the minor role it played in its byproduct production process.  Id. at 30–31.  Moreover, Vinh Hoan argues the Philippine import data in the same HTS category used by Commerce in its preliminary determination resulted in a value of $2.06 per kilogram.  Id. at 30 (citing Prelim. Surrogate Value Memo at 5).  Vinh Hoan also argues that the Indonesian value is almost five times higher than the value used in Commerce's preliminary determination.  Id.  Vinh Hoan argues that this large an increase cannot logically be attributable solely to the change in

surrogate country, but must be attributable to aberrational data or non-specific imports included within the data.  Id.

Commerce did not address this record evidence.  On remand, it must do so.  While Commerce may rely on its regulatory preference if the data from the primary surrogate country otherwise meets its criteria, Commerce has not explained why its conclusion that the import data is specific and not aberrational is reasonable in light of this detracting evidence raised by Vinh Hoan.

### C.    Financial Ratios

#### 1.  Selection of Financial Statements

Anvifish and Vinh Quang challenge Commerce's selection of Indonesian seafood processor DSFI's 2011 financial statements to value its financial ratios because they are unreliable and unrepresentative.  Anvifish & Vinh Quang Br. 20.  Defendant counters that Commerce's selection of DSFI's financial statements is supported by substantial evidence.  Def.'s Resp. Br. 73–74.  The court determines that Commerce's selection of 2011 financial statements of Indonesian seafood processor DSFI is supported by substantial evidence.

Commerce's practice is to select financial statements by using data from a market economy surrogate company gathered from producers of identical or comparable merchandise in the surrogate country.  Final Decision Memo at 28.  Commerce applies a three-part test to considering what constitutes comparable merchandise, evaluating: (1) physical characteristics; (2) end uses; and (3) production processes.  Id.

Commerce found that DSFI's 2011 financial statements are contemporaneous, complete, publicly available, from the primary surrogate country, and that the company manufactures merchandise comparable to subject merchandise. Id. at 29. Commerce concluded the company produces comparable merchandise because it is a fish producer. Id. Although Commerce recognized that VASEP and Vinh Hoan had objected that DSFI is not a producer of comparable merchandise because it processes ocean fish, Commerce reasonably concluded its activities are comparable to respondents' because, like respondents, it processes fresh fish. See id.

In its final determination, Commerce concluded that the financial statements of Indonesian company CP Proteinprima are less contemporaneous since these financial statements are from 2007. Id. Commerce also concluded that surrogate financial statements from Bangladeshi and Philippine companies are not the best available information because the DSFI financial statements meet its SV selection criteria and are from the primary surrogate country. At the same time, however, Commerce had also relied upon its selection of the DSFI financial statements to support its surrogate country selection. Id. at 30.

In Vinh Hoan, the court instructed Commerce that it could not base its primary surrogate country decision in part on its selection of surrogate financial statements and base its selection of financial statements on its primary surrogate country selection. See Vinh Hoan, 39 CIT at __, 49 F. Supp. 3d at 1311. The court reserved review of whether the DSFI statements are the best information available until after Commerce reconsiders its primary surrogate country selection. Id. The court instructed that "Commerce must

compare financial statements in the first instance." Id.  As discussed, Commerce found

in its remand results that DSFI's financial statements are the best available information

and support the selection of Indonesia as the primary surrogate country.  Remand Results

74–75.  Anvifish and Vinh Quang argued before Commerce that surrogate financial

statements from Apex and Gemini are the best available information because DSFI is not

a comparable business and was suffering financial difficulties during the POR.  See Final

Decision Memo at 28.  Commerce specifically addressed these arguments in its final

determination, finding that DSFI's 2011 financial statements are comparable because

DSFI produces fresh fish and that DSFI was profitable during the POR and its past

financial issues do not impact the suitability of DSFI's financial statements.  Id. at 29.  In

its remand results, Commerce compared DSFI's financial statements to those of Apex

and Gemini, and, as already discussed, found DSFI's production is more comparable to

that of respondents because DSFI's core business is frozen fish fillets whereas that of

Apex and Gemini is frozen shrimp products.  Remand Results 74.  Therefore, Commerce

reasonably selected 2011 DSFI financial statements as the best available information to

value respondents' financial ratios.

Anvifish and Vinh Quang argue that Commerce ignored evidence of DSFI's poor

financial health, including the liabilities still owed during the POR as a result of a

bankruptcy in the fiscal year from 2010 through 2011.  Anvifish & Vinh Quang Br. 21.

Anvifish and Vinh Quang further argue that this bankruptcy resulted in substantial loan

and credit restructuring, which undermined Commerce's conclusion that DSFI was

profitable and comparable to respondents' experience.  Id.  Yet, Anvifish and Vinh Quang

point to no record evidence undermining Commerce's findings regarding profitability or comparability of the companies' experiences.[21]  Therefore, Commerce's conclusions are reasonable.

Anvifish and Vinh Quang further argue that DSFI's financial statements are unreliable for purposes of obtaining accurate surrogate financial ratios because "DSFI is a large, consolidated enterprise with many subsidiaries, some of which are shown to be engaged in fishing operations (marine fishing only) . . . [and] DSFI engages in fishing and processing of marine fish (octopus, cuttlefish, tuna, snapper and grouper)."  Anvifish & Vinh Quang Br. 22 (citing CFA Surrogate Value Comments at Ex. 36, PD 155–158, bar codes 3076948-01–04 (May 24, 2012) ("CFA Surrogate Value Comments")).  Anvifish and Vinh Quang argue that such differences "necessarily result in different overhead; [SG&A]; and profit experiences."  Id.  However, Anvifish and Vinh Quang's claims about these differences in production processes, and any potential effects upon financial ratios, are not supported by any evidence in the record.  In the absence of record evidence supporting their claims of the effects these differences upon financial ratios of DSFI or a similarly situated company, Commerce's conclusions are reasonable.[22]  Therefore,

---

[21] Commerce considered DSFI's past unprofitable business cycles, and found that it was profitable during the POR.  Final Decision Memo at 29.  Commerce further noted that past unprofitable business cycles alone are not indicative of the company's future performance.  Id. Commerce discounted DSFI's debt and credit restructuring circumstances because it concluded that the company was profitable during the POR.  Id.

[22] Anvifish and Vinh Quang's references to differences in margins and financial ratios between Commerce's preliminary determination and its final determination alone do not demonstrate a difference in the merchandise or production experiences between DSFI and that of respondents.

(footnote continued)

Commerce has compared the available financial statements as instructed by the court and has reasonably selected DSFI's financial statements as the best available information.

### 2.  "Freight-In" Expenses in SG&A

Vinh Hoan challenges Commerce's inclusion of "freight-in" expenses within respondents' SG&A expense ratio.  Vinh Hoan Br. 47–48.  Defendant argues that Commerce reasonably included these costs in SG&A expenses.  Def.'s Resp. Br. 76. The court agrees with Defendant.

Commerce included the "freight-in" expenses in SG&A because this expense is listed under SG&A in DSFI's financial statements.  Final Surrogate Value Memo at 7, 7 n.28; Eighth Administrative Review and Aligned New Shipper Reviews of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Ministerial Error Allegation Memo at 3, PD 466, bar code 3136028-01 (May 9, 2013); see also CFA Surrogate Value Comments at Ex. 36.  Vinh Hoan claims the plain meaning of "freight-in" clearly refers to "the cost of transporting raw materials to the plant for use in the production process," which it argues is included elsewhere in Commerce's calculations.  Vinh Hoan Br. 48.

---

See Anvifish & Vinh Quang Br. 25, Attach. 2.  Moreover, Anvifish and Vinh Quang's comparison is limited to one other data point, i.e., Bangladeshi company, Apex.  See id. at 25.  They do not argue that DSFI's financial ratios were statistical outliers.  See id.  Therefore, Anvifish and Vinh Quang's reliance upon Lifestyle Enter., Inc. v. United States, 35 CIT __, 768 F. Supp. 2d 1286 (2011), is inapposite.  See Lifestyle Enter., Inc., 35 CIT at __, 768 F. Supp. 2d at 1310 (2011) (holding that Commerce need not exclude every company with an outlying factory overhead ratio or SG&A ratio, but only significant statistical outliers require an explanation of how the company maintains a comparable production process).

Given that Vinh Hoan points to no record evidence supporting the notion that DSFI's "freight-in" reflected the definition it advances, Commerce's conclusion is reasonable.

Vinh Hoan maintains that Commerce's calculations count the same expenses twice, first within SG&A expenses and again as part of the total materials costs. Vinh Hoan Br. 49. In the alternative, Vinh Hoan argues that these "freight-in" expenses are already included as movement expenses. Vinh Hoan Br. 49–50. Yet, Vinh Hoan points to no record evidence to support the notion that DSFI's "freight-in" expense is already captured elsewhere either in DSFI's financial statements or in Commerce's calculations.[23] Vinh Hoan's argument relies upon its speculation as to general accounting practices within the industry.[24] Accordingly, Commerce reasonably declined to exclude these expenses because it treated these expenses as DSFI did in its financial statements.

---

[23] Defendant explains that Vinh Hoan's speculation that these expenses are movement expenses is belied by how DSFI reported the expenses in its financial statements. Def.'s Resp. Br. 77–78. Defendant argues that if these expenses are for transporting raw materials, as Vinh Hoan speculates, "then it arguably would be included under 'cost of sales' or 'packing usage and transportation' in the DFSI statement" and not as a selling expense in Note 22 of its financial statements. Id. at 77 (citing CFA Surrogate Value Comments at 137–138). Since they are not, Commerce reasonably concluded that the "freight-in" entry within SG&A is not already included in DSFI's financial statements.

[24] Vinh Hoan also argues Commerce's practice is generally to exclude "freight-in" costs from the SG&A ratio because they are otherwise included in Commerce's dumping calculations. Vinh Hoan Br. 48 (citing Sodium Hexametaphosphate From the People's Republic of China, 75 Fed. Reg. 64,695 (Dep't Commerce Oct. 20, 2010) (final results of the AD administrative review) and accompanying First Administrative Review of Sodium Hexametaphosphate from the People's Republic of China: Issues and Decision Memorandum for the Final Results at 2–21, A-570-908, (Oct. 12, 2010), available at http://ia.ita.doc.gov/frn/summary/prc/2010-26458-1.pdf (last visited May 20, 2016) ("SH from PRC I&D"); Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 75 Fed. Reg. 47,771 (Dep't Commerce Aug. 9, 2010) (final results and partial rescission of AD administrative review) and accompanying Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final

(footnote continued)

### D.      Inland Freight and Brokerage and Handling

Vinh Hoan challenges Commerce's use of an assumed weight from the World Bank's "Doing Business 2012: Indonesia" rather than the container weight on the record from Maersk to calculate respondents' per-unit inland freight and brokerage and handling expenses.  Vinh Hoan Br. 53–54.  Defendant counters that Commerce "relied upon the weight (10,000 kg) and container size (20-foot container)" reported in the "Doing Business" report.  Def.'s Resp. Br. 78.  Commerce reasonably refused to adjust the container weight from the Indonesian data source to reflect that reported by Maersk.

In its preliminary results, Commerce valued inland freight and brokerage and handling using the World Bank's "Doing Business 2011: Bangladesh."  Prelim. Surrogate Value Memo at 7.  Commerce found the report gathers information concerning the distance and cost to transport products in a 20-foot container from the largest city in Bangladesh to the nearest seaport.  Id.; see also id. at Ex.1.  Commerce calculated a per-unit surrogate inland freight and brokerage and handling rate using the weight of a full 20-foot standard container, as provided by Maersk.  Id. at 7; see also id. at Ex. 1.  The weight provided by Maersk for the preliminary results was 28,200 kilograms.  Id. at Ex. 1.  Using

---

Results of 2008–2009 Administrative Review at 11, A-552-802, (July 30, 2010), available at http://ia.ita.doc.gov/frn/summary/vietnam/2010-19577-1.pdf (last visited May 20, 2016) ("Shrimp from Vietnam I&D")); Reply of Pl. Vinh Hoan Corporation Def.'s Resp. Pls.' Mots. J. Upon Agency R. 10, Sept. 5, 2014, ECF No. 100.  However, Vinh Hoan attempts to apply the practice more broadly than Commerce does.  Commerce's practice is to avoid double-counting of movement expenses such as freight only where the description within the potential surrogate company's financial statements indicates these expenses are included within its SG&A expenses.  See SH From PRC I&D at 20–21; Shrimp from Vietnam I&D at 11.  Here, Commerce found no such indication in DSFI's financial statements.  See Final Surrogate Value Memo at 7, 7 n.28.

this weight, Commerce calculated a per-unit SV of inland freight rate of $0.00008/kg/km and a per-unit brokerage and handling SV of $0.0293/kg.  Id. at 7.

In its final results, Commerce valued inland freight and brokerage and handling using the World Bank's "Doing Business 2012: Indonesia."  Final Surrogate Value Memo at 8.  Commerce noted the report provides pricing for brokerage and handling and freight assuming the distance from the largest city in Indonesia to the nearest seaport in a standard 20-foot container.  Id.  Commerce calculated a per-unit surrogate inland freight and brokerage and handling rate using the weight of a full 20-foot standard container as provided by the Doing Business data source.  Id. at Ex. 8.  Commerce used the assumed weight provided by Doing Business is 10,000 kilograms to calculate a per-unit SV for inland freight rate of $0.0009/kg/km and a per-unit brokerage and handling SV of $0.0463/kg.  Id. at 8.  No party challenges the determination that the Indonesian source represented the best available data on the record.

Vinh Hoan challenges Commerce's use of the assumed weight provided by the Indonesian Doing Business statistics over the weight provided by Maersk for a hypothetical 20-foot container at full capacity.  Vinh Hoan Br. 53–54.  However, Vinh Hoan points to no record information to challenge the reliability of the assumed weight provided by the Doing Business report.  Instead, it speculates that the container weight provided by the shipper must be more reliable. [25]  See id. at 53.  There is no evidence on the record

---

[25] Vinh Hoan repeatedly refers to the weight given by the shipper, Maersk, as an "actual weight," but Vinh Hoan does not argue that it, or any other respondent, reported an actual weight of the containers it uses to ship subject merchandise.  See Vinh Hoan Br. 53–54.

to suggest whether the "Doing Business 2012: Indonesia" report adjusted its reported freight costs to reflect its assumed container weight of 10,000 kg.  In the absence of record evidence to suggest that the Maersk weight estimate more accurately reflected either the experience of the respondents or the actual weight of a 20-foot container at full capacity, it is reasonable that Commerce determined that using the "Doing Business 2012: Indonesia" report, with internally consistent assumptions, is the best available information for valuing respondents' inland freight and brokerage and handling FOPs.  Therefore, the court sustains this determination.

### E.    Frozen Broken Meat Byproducts

Vinh Hoan challenges Commerce's selection of Indonesian import data under HTS 0304.99 over HTS 0304.29 to value frozen broken meat on specificity grounds.  See Vinh Hoan Br. 42.  Defendant claims Commerce's choice is reasonable.  See Def.'s Resp. Br. 66–68.  The court agrees that Commerce's choice is reasonable.

Commerce found that HTS 0304.99, which covers "Other Fish Meat (Whether or Not Minced) Frozen," is more specific than Vinh Hoan's proffered HTS category "because it includes all frozen fish meat products of other types and is more representative of the frozen broken fillet by-product input reported by the respondents."  Final Decision Memo 39–40 (citing CFA Surrogate Value Comments at Ex. 19).[26]  Vinh Hoan asks the court to

---

[26] Commerce supports its finding that HTS 0304.99 includes frozen fish meat products, including the frozen broken fillet by-product, by referencing a chart listing the data sources that Commerce used in its preliminary results.  Final Decision Memo at 40 n.254 (citing Prelim. Surrogate Value Memo at 5–6).  This source neither lends support, nor detracts from Commerce's assertion.

(footnote continued)

reweigh the evidence.  See Vinh Hoan Br. 42.  Vinh Hoan argues Commerce's finding

regarding HTS 0304.29 lacked explanation because it had reached a different conclusion

in the preceding administrative review.  Id. at 43.  However, Vinh Hoan offers no record

evidence that undermines Commerce's specificity finding or the notion that the HTS

heading advocated by Vinh Hoan is more specific.[27]

    Vinh Hoan argues that because it calls the by-product "frozen broken meat" not

"frozen minced meat," it is reasonable to conclude the "by-product produced and sold by

Vinh Hoan is not minced."  Reply of Pl.  Vinh Hoan Corporation Def.'s Resp. Pls.' Mots.

J. Upon Agency R. 7, Sept. 5, 2014, ECF No. 100.  Even if Vinh Hoan is correct, this

argument fails to show that Commerce's choice is unreasonable because it does not

present record evidence that minced meat has a significantly different value than broken

meat.  At best, Vinh Hoan proposes an alternative HTS that could also be reasonable.

The court's standard of review precludes reweighing the evidence and substituting

judgment for Commerce.  Therefore, Commerce's selection to value frozen broken meat

in this review is reasonable.

---

Nonetheless, Vinh Hoan does not challenge this assertion.  Commerce found HTS 0304.29, which covers "Fish Fillets, Frozen, Nesoi," is not specific because it includes whole unbroken fish fillets. Final Decision Memo at 30.  The record as a whole supports Commerce's finding.  See CFA Surrogate Value Comments at Ex. 30 (reflecting Indonesian import statistics summary information that includes a description of the HTS category title).

[27] Vinh Hoan's citation to Commerce's findings in the seventh administrative review ignore the fundamental principle of administrative law that an agency reaches its determinations based upon the record before it.  Thus, judicial review of such determinations must be limited to the record before the agency compiled during the segment of the proceeding under review.  Cf. QVD Food Co., 668 F.3d at 1324–25 (holding that "[j]udicial review of antidumping duty administrative proceedings is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings").

### F.    Fresh Broken Meat Byproducts

Commerce valued fresh broken meat using a price quote from Vitarich Corporation, a Philippine fish processor.  Final Decision Memo at 40–41.  Vinh Hoan argues that Commerce should use Indonesian import data under HTS 0304.19 because the Vitarich price quote is not specific.  Vinh Hoan Br. 43–44.  Commerce reasonably selected the Vitarich price quote to value respondents' fresh broken meat byproduct.

Commerce found that the Vitarich price quote is more specific than Indonesian import data because it covers the "exact by-product produced by the respondents of fresh broken fillets."[28]  Final Decision Memo at 40 (citing CFA Surrogate Value Comments at Ex. 30).  Commerce found the price quote reliable because it: (1) is accompanied by a signed affidavit from petitioners' attorney in the Philippines indicating it was obtained directly from Vitarich and issued by a company official for sales in the ordinary course of business; (2) is issued on company letterhead; and (3) includes the business card of the sales and marketing director of the company.  Id. at 41.  The court cannot say Commerce's explanation is unreasonable.  Commerce also reasonably concluded the quote is tax and duty exclusive, publicly available, and contemporaneous.  Id. at 40–41. In contrast, Commerce found that the Indonesian import data for HTS 0304.19, which is titled "Fish Fillets And Other Meat, Fresh Or Chilled, Excluding Steaks, Nesoi," is not

---

[28] Vinh Hoan challenges Commerce's specificity finding because it argues the price quoted is for "trimmings" and it is not clear that trimmings and fresh broken meat are the same thing.  Vinh Hoan Br. 41–42.  However, the record contains data that Vinh Hoan described its by-product as "derived from the trimming step."  See Vinh Hoan Section D Resp. at 39.  Vinh Hoan points to no record evidence to suggest that trimmings and fresh broken meat are not the same.  Therefore, Commerce's finding is reasonable.

specific because the category, by its terms, includes whole fish fillets that are unbroken. Id. at 40 (citing CFA Surrogate Value Comments at Ex. 30).   Therefore, Commerce reasonably concluded that the Vitarich quote is the best information available.

Vinh Hoan challenges Commerce's reliability finding, arguing that neither the quote itself nor the accompanying affidavit contain sufficient detail to reasonably conclude the price quote data was reliable or tax and duty-exclusive.[29]   See Vinh Hoan Br. 43 (referencing Vinh Hoan Section D Resp. at 33-36).   Vinh Hoan's argument asks the court to reweigh the evidence.  See id. at 35–36.

Vinh Hoan argues that Commerce should have used Indonesia import data for HTS 0304.19 "Fish Fillets And Other Meat, Fresh Or Chilled, Excluding Steaks, Nesoi" because it is specific to respondents' byproduct.  Vinh Hoan Br. 44.  As already discussed, Commerce found the import category, by its terms, includes whole fish fillets.  See Final Decision Memo at 40 (citing CFA Surrogate Value Comments at Ex. 30).  Vinh Hoan cites no record evidence undermining Commerce's conclusion.

---

[29] Vinh Hoan contests the reliability of the Vitarich price quote on several grounds.  For example, it argues the quote itself is not signed, nor does it otherwise indicate the quote itself was given by a company representative.  Vinh Hoan Br. 35.  Commerce considered this fact, but found that the accompanying affidavit made clear that the price quote is signed and provided by a Vitarich sales and marketing director.   See Final Decision Memo at 41.   Likewise, Commerce specifically credited the fact that the quote is on official company letterhead and accompanied by Vitarich's Sales and Marketing Director's business card.  Id.  Also, Vinh Hoan argues no evidence indicates the quote is on a tax-exclusive basis because only the affidavit says it is.  See Vinh Hoan Br. 36. Vinh Hoan also suggests that the delay in obtaining the quote needs to be explained.  See id. at 35–36.

### G.    Fish Waste, Fish Belly, and Fish Skin Byproducts

Vinh Hoan, Anvifish, and Vinh Quang challenge Commerce's selection of the Vitarich price quote to value respondents' fish waste, fish belly, and fish skin byproducts as unsupported by substantial evidence.  Vinh Hoan Br. 33; Anvifish & Vinh Quang Br. 26.  The court determines that Commerce's determination is reasonable.

Commerce found the Vitarich price quote specific to the byproducts produced by respondents because it specifically includes "head and belly waste, fat and intestines, bone and tails waste, and skin and trimmings."[30]  Final Decision Memo at 35.  Commerce acknowledged that the Vitarich quote is not contemporaneous, but it found this source more contemporaneous than the Bangladeshi Asian Seafood price quote, because it is from only four months prior to the POR whereas the Bangladeshi price quote was from more than a year after the POR.  Id.  Commerce also found the Vitarich price quote is publicly available and tax and duty exclusive.  Id.  Commerce found the price quote reliable,[31] noting that the affidavit indicates the price quote was obtained directly from

---

[30] Anvifish and Vinh Quang argue that the Vitarich price quote is not more specific to their byproducts because Anvifish only reported selling general fish waste and did not separately sell fish skins from the general fish scrap it generated.  Anvifish & Vinh Quang Br. 31.  However, even if the court were to reject Commerce's finding that the Vitarich price quote is more specific to Anvifish, as opposed to Vinh Hoan, which did report selling more specific fish waste byproducts, Commerce's finding is still supported by substantial evidence because it finds the Vitarich price quote was more contemporaneous

[31] Vinh Hoan, Anvifish, and Vinh Quang argue that Commerce's finding that the Vitarich price quote is reliable is belied by its finding in the sixth and seventh administrative reviews. Vinh Hoan Br. 33–34; Anvifish & Vinh Quang Br. 28–29. However, in those reviews, Commerce did not find the Vitarich price quote unreliable, but rather, found import data on the record better satisfied its data selection criteria. See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 76 Fed. Reg. 15,941 (Dep't Commerce Mar. 22, 2011) (final results of the sixth AD administrative

(footnote continued)

Vitarich and issued by a company official for sales in the ordinary course of business.[32]
Id. at 35–36.

        In contrast, Commerce found the price quote from Bangladeshi seafood processor,
Asian Seafood, less specific than the Vitarich quote because it "lists only pangasius fish
waste, instead of multiple kinds of fish waste products."  Id. at 35.  As already discussed,
the Bangladeshi price quote is from more than a year after the POR.   Commerce
reasonably concluded the Vitarich price quote is superior to the Asian Seafood quote
based upon the former's greater contemporaneity and specificity.

        Commerce also reasonably determined the Vitarich quote is superior to Indonesian
import statistics.  Id. at 36.  Commerce found that the Indonesian import statistics are not
specific because it is unclear whether the HTS heading 0511.91.90, which covered
"Animal Products Nesoi; Dead Animals, Unfit for Human Consumption, Other Product of
Fish or Crustaceans, Moluscs or Other Aquatic Invertebra," even included fish waste
because Commerce found fish waste was not included among the products listed in the

---

review and sixth new shipper review) and accompanying Certain Frozen Fish Fillets from the
Socialist Republic of Vietnam ("Vietnam"): Issues and Decision Memorandum for the Final Results
of the Sixth Antidumping Duty Administrative Review an New Shipper Review at 30–31, A-552-
801, (Mar. 14, 2011), available at http://ia.ita.doc.gov/frn/summary/vietnam/2011-6564-1.pdf (last
visited May 20, 2016); Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 77 Fed.
Reg. 15,039 (Dep't Commerce Mar. 14, 2012) (final results and partial rescission of the seventh
AD administrative review) and accompanying Certain Frozen Fish Fillets from the Socialist
Republic of Vietnam ("Vietnam"): Issues and Decision Memorandum for the Final Results of the
Seventh Antidumping Duty Administrative Review at 18, A-552-801, (Mar. 7, 2012), available at
http://ia.ita.doc.gov/frn/summary/vietnam/2012-6201-1.pdf (last visited May 20, 2016).

[32] As it had for fresh broken meat, Commerce relies on the affidavit of a Filipino attorney
accompanying the price quote to find that the price quote includes terms of payment, is publicly
available, represents a broad market average and is net of taxes.  Final Decision Memo at 35
(citing CFA Surrogate Value Data at Ex. 19).  The court declines to reweigh this evidence.

HTS category.  Id.  Commerce also found that fish waste products are not generally internationally traded, but it cites to no record evidence for this finding.[33]  Id.  Commerce nonetheless determined that the import data under this HTS category is aberrational because "[v]aluing fish waste using import statistics illogically results in a fish waste SV which is higher than that of the whole fish."[34]  Id.  Commerce therefore found that using import statistics would distort its normal value calculation.  Id.

Vinh Hoan, Anvifish, and Vinh Quang's arguments that the Vitarich quote's reliability problems weigh in favor of selecting the Asian Seafood Price quote fail to persuade the court.  Vinh Hoan Br. 35–37; Anvifish & Vinh Quang Br. 29–30.  These parties essentially repeat their criticisms of the affidavit submitted together with the Vitarich price quote discussed earlier, impugning the reliability of a price quote obtained by a Filipino attorney retained by respondents.  The court defers to Commerce's assessment of the credibility of this affidavit and declines to reweigh the evidence because no party points to record evidence that detracts from Commerce's findings.

Vinh Hoan argues that the Asian Seafoods quote is equally specific because all of the fish waste items it produced are listed in the quote.  Vinh Hoan Br. 38–39.  Commerce

---

[33] Vinh Hoan correctly points out that Commerce does not support this finding with any reference to the record, but it does not cite any record evidence to the contrary.  Vinh Hoan Br. 40.  Commerce adequately supported its finding that the Indonesian import data is aberrational, so the court nonetheless finds Commerce's appraisal of the Vitarich price quote's superiority to Indonesian import data to be supported by substantial evidence.

[34] Anvifish and Vinh Quang argue that Commerce's conclusion that the byproduct costing more than the whole fish is illogical is not supported by substantial evidence.  Anvifish & Vinh Quang Br. 32.  They argue that the processing of fish into usable components creates value.  Id. at 32–33.  However, they cite no record evidence that their production process results in any significant added value.  See id.

reasonably concluded otherwise noting that Asian Seafoods price quote lists only pangasius fish waste. Final Decision Memo at 35. Because Commerce's reading is at least equally reasonable to Vinh Hoan's, the court defers to its assessment.[35]

## CONCLUSION

For the reasons discussed above, the court sustains Commerce's selection of Indonesia as the primary surrogate country, its determination to adjust Vinh Hoan's margin calculations to reflect sales exclusive of glazing, and its treatment of consignment sales as supported by substantial evidence and in accordance with law.  The court remands Commerce's decision to use a constructed value to value Vinh Hoan's fish oil and the byproduct offset calculation in its remand redetermination for reconsideration and explanation consistent with this opinion.

On the issues in Commerce's final determination for which the court reserved judgment, the court sustains Commerce's SV data selections for the following inputs: (1) labor; (2) financial ratios; (3) inland freight and brokerage and handling; (4) frozen broken meat; (5) fresh broken meat; and (6) fish waste, fish belly, and fish skin.  The court also sustains Commerce's determination not to exclude the "freight-in" expense within the SG&A expense reported in the financial statements it selected to value respondents' financial ratios.  However, the court remands Commerce's SV data selections for rice

---

[35] Finally, Vinh Hoan relies upon Ad Hoc Shrimp Trade Action Comm. v. United States, 36 CIT __, 882 F. Supp. 2d 1366 (2012), for the proposition that Commerce should examine the source of SV data for each FOP and consider the relative economic comparability of the source in making its evaluation.  See Vinh Hoan Br. 39.  Nothing in this case supports Vinh Hoan's reading.  The issue in that case involved primary surrogate country selection, not selection of SV data for valuing specific FOPs.  See Ad Hoc Shrimp, 36 CIT at __, 882 F. Supp. 2d at 1374–75.  Moreover, the court did not require a weighing of economic comparability in every case.  Id.

husk and sawdust for further consideration and explanation.  Therefore, in accordance with the foregoing, it is hereby

ORDERED that Commerce's remand redeterminations regarding fish oil and the byproduct offset calculation are remanded for further consideration consistent with this opinion; and it is further

ORDERED that Commerce's determinations regarding surrogate value data selections for valuing rice husk and sawdust are remanded for further consideration consistent with this opinion; and it is further

ORDERED that Commerce shall file its second remand redetermination with the court within 60 days of this date; and it is further

ORDERED that the parties shall have 30 days thereafter to file comments on the second remand redetermination; and it is further

ORDERED that the parties shall have 15 days to file their replies to comments on the second remand redetermination.


                                         /s/ Claire R. Kelly
                                        Claire R. Kelly, Judge

Dated:May 26, 2016
         New York, New York